**BENTSON CONTRACTING COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent (Two Cases).**

**Nos. 89–1691, 90–1473.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 25, 1991.

Decided Aug. 27, 1991.

Gerard Morales, with whom William P. Allen, Phoenix, Ariz., was on the brief, for petitioner in 89–1691 and 90–1473.

Beverly A. Oyama, Atty., N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Collis Suzanne Stocking, Supervisory Atty., N.L.R.B., Washington, D.C., were on the brief, for respondent in both cases. Howard E. Perlstein, Washington, D.C., also entered an appearance for respondent.

Before BUCKLEY, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This case is here on consolidated petitions for review of three orders of the National Labor Relations Board finding that Bentson Contracting Company unlawfully refused to bargain with three unions, and on the Board's cross-applications for enforcement of its orders requiring the company to bargain.

Bentson is an Arizona corporation engaged in the business of highway and heavy construction work such as dirt excavation, asphalt paving, and resurfacing roads. At any one time, the company is engaged in approximately ten projects, with a crew at each jobsite. For many years, the company recruited its work force from the hiring halls of three labor unions [1]—the Operating Engineers, the Teamsters and the Laborers—with whom it had signed voluntary pre-hire collective bargaining agreements, in accordance with section 8(f) of the National Labor Relations Act (NLRA or the Act), 29 U.S.C. § 158(f). Section 8(f) allows employers in the building and construction industry to bargain with a union without an initial election or showing of majority support. When the then-current collective bargaining agreements expired at the end of May 1988, Bentson repudiated its section 8(f) relationships with the unions and instituted new working conditions emphasizing on-the-job employee cross-training. At the time, Bentson employed some 40 construction workers.

The three unions filed separate petitions with the National Labor Relations Board, under section 9(c) of the NLRA, 29 U.S.C. § 159(c), seeking certification as the exclusive bargaining agent of the workers it had traditionally represented under the expired

---

1. The unions were: (1) the International Union of Operating Engineers Local No. 428, AFL–CIO; (2) the Transport, Local Delivery and Sales Drivers, Warehousemen and Helpers, Mining and Motion Picture Production, State of Arizona, Local Union No. 104, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO; and (3) the Laborers District Council of the State of Arizona, including Local Unions 383 and 479.

section 8(f) collective bargaining agreements. The Operating Engineers sought to represent a unit consisting of "[a]ll equipment operators, servicemen, mechanics, and apprentices"; the Teamsters sought to represent a unit composed of "[a]ll drivers, warehousemen, mechanics, and field servicemen"; the Laborers sought to represent a unit composed of "[a]ll employees performing laborers work under the recently expired collective bargaining agreements." Bentson claimed that the only appropriate unit was a company-wide unit composed of all "construction employees."

After hearings, the NLRB Regional Director issued two decisions—one on the "Laborers" petition, the other on the "Operating Engineers" and "Teamsters" petitions—describing the bargaining units and ordering representative elections among the employees in the units. In the first decision, issued in July 1988, the Director found that an appropriate unit was composed of "laborers primarily ... engaged in manual work." The laborer unit included approximately 15 employees. Of these, there were five "combination" employees, who perform "substantial general laborer work" as well as "drive trucks which haul asphalt or debris." In the second decision, issued in September 1988, the Director found that "the operating engineers employed by the Company spend virtually all of their work time engaged in the operation of heavy equipment, which includes compaction rollers, scrapers, blades, front end loaders, and sweeping devices called power brooms." The Director also found that the "Employer's truckdrivers spend virtually all of their work time driving various types

of trucks." Again, the Director noted that there were five "combination" employees who "perform substantial general laborer work and [ ] spend a substantial portion of their work time driving trucks." Although the Director acknowledged that these "combination" workers had already been found eligible to vote in the laborers election, he concluded that they also should be permitted to vote in the truckdrivers election. The Director found that the heavy equipment operators and the truckdrivers each constituted an appropriate bargaining unit, distinct from one another and from the laborers. The operators unit included about 20 workers, while the truckdrivers unit included 7.

In the elections, each union received a majority of the votes cast and was duly certified. Bentson continued to insist that a company-wide unit was the only appropriate one and refused to bargain. The unions then filed individual charges alleging that Bentson was engaging in unfair labor practices. In *Bentson I*, 297 N.L.R.B. No. 27 (Oct. 31, 1989) ("Operating Engineers"), *Bentson II*, 297 N.L.R.B. No. 84 (Jan. 31, 1990) ("Teamsters"), and *Bentson III*, 298 N.L.R.B. No. 14 (Apr. 11, 1990) ("Laborers"), the Board held that Bentson had violated section 8(a)(5) and (1) of the NLRA, 29 U.S.C. § 158(a)(5) and (1), and ordered the company to bargain with the unions.

I

We will first consider the Board's orders in *Bentson II* (Teamsters) and *Bentson III* (Laborers).[2] In *Bentson II*, the Board sustained the following unit:

---

**2.** Bentson argues that the complaint in *Bentson III* is time-barred under section 10(b) of the NLRA, 29 U.S.C. § 160(b), which reads, in pertinent part:

*Provided* ... no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board....

The chronology here is as follows. The Laborers union was certified on November 22, 1988. The union filed an unfair labor practice charge with the Board on July 22, 1989, alleging that Bentson had refused to bargain with it since December 13, 1988. This charge was

withdrawn in early August 1989. On August 9, 1989, the Laborers again requested the company to bargain, and on August 14, 1989, the company again refused. On October 10, 1989, the union filed the unfair labor practice charge that is the basis of the bargaining order in *Bentson III*. If the six-month period began running from December 1988, the complaint was time-barred; if it ran from August 1989, it was not.

The Board ruled that the company had an obligation to bargain with the union for a period of one year from the date of certification and that the company's refusal to bargain in August 1989 constituted an independent unfair labor

All truckdrivers, combination truckdrivers, truck mechanics, warehousemen, and field servicemen employed by the [Employer], but excluding all other employees, heavy equipment operators, servicemen, mechanics, heavy equipment operator apprentices, laborers, guards and supervisors as defined in the Act.

Of the 7 workers in this unit, 5 were "combination" employees—that is, individuals who not only drove trucks but also performed laborer work. As a result, these combination employees were not only members of the truckdrivers unit but also among the 15 members of the laborers unit sustained in *Bentson III* (Laborers), which consisted of:

All laborers employed by the [Employer] within the State of Arizona; but excluding all other employees, heavy equipment operators, truckdrivers, truck mechanics, servicemen, office clerical employees, guards and supervisors as defined by the Act.

■ In designating an appropriate bargaining unit, the Board performs the function assigned to it by section 9(b) of the Act.[3] The Board has wide discretion in these matters and reviewing courts must generally defer to its judgment that a particular unit is appropriate. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975); *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 171–72, 92 S.Ct. 383, 393–94, 30 L.Ed.2d 341 (1971). The central test is whether the workers share a "community of interest," that is, " 'substantial mutual interests in wages, hours, and other conditions of employment.' " *Allied Chemical & Alkali Workers*, 404 U.S. at 172, 92 S.Ct. at 394 (citation omitted); *see also Food Store Employees Union v. NLRB*, 422 F.2d 685 (D.C.Cir.1969). The Board considers several factors, but "there are no per se rules" to resolve unit determinations: "we examine the community of interest of the particular employees involved, considering their skills, duties, and working conditions, the Employer's organization and supervision, and bargaining history, if any, but no one factor has controlling weight." *Airco, Inc.*, 273 N.L.R.B. 348 (1984).

■ The unusual feature of this case is that the Board has placed the same employees in two separate bargaining units despite the statutory principle of exclusive representation. Section 9(a) of the Act provides that representatives selected by a majority of employees in an appropriate unit "shall be the exclusive representatives of all employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment." 29 U.S.C. § 159(a). As a result of the Board's unit determinations, however, all "combination" employees wound up with two representatives, neither of which had any claim to exclusivity.

The Board asserts that the "combination" workers are dual-function employees who are properly eligible to vote in repre-

---

practice giving rise to a new six-month period in which to bring charges. *Bentson III*, 298 N.L.R.B. No. 14 at 3–7. Section 10(b) is silent with respect to the question thus presented. The statutory language "based upon any unfair labor practice" does not say the period runs only from the initial refusal to bargain. While there may be good reasons to support that view, such as the propriety of having these matters promptly determined, there are also rational considerations on the other side, such as the lack of any need to rely on evidence older than six months to decide if the employer actually refused the union's request. *Compare Machinists Local 1424 v. NLRB*, 362 U.S. 411, 416–17, 80 S.Ct. 822, 826–27, 4 L.Ed.2d 832 (1960). We must therefore defer to the Board's reasonable interpretation of section 10(b), as did the court

of appeals in *J. Ray McDermott & Co. v. NLRB*, 571 F.2d 850, 858 (5th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978). *See NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987). Since the second refusal to bargain occurred within the certification year and charges were brought less than two months after the refusal, the complaint in *Bentson III* was timely.

3. The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof. . . .
29 U.S.C. § 159(b).

sentation elections for both units since they have a substantial interest in the wages, hours, and other terms and conditions of employment of both units. The Board has treated dual-function employees like part-time workers, considering them eligible to vote in a unit if they spend a substantial amount of time working within it and thereby have a significant interest in the terms and conditions of employment. *See Berea Publishing Co.,* 140 N.L.R.B. 516 (1963); *The Ocala Star Banner,* 97 N.L.R.B. 384 (1951). In *Sunray Ltd.,* 258 N.L.R.B. 517, 518 (1981), however, the Board stated that the *Berea Publishing* and *Ocala Star* rule regarding dual-function employees "does not, and was never intended to, create more than one unit consisting of an entire work force just because all employees perform several craft functions. To do so could cause a situation where an appropriate unit of all of the Employer's employees elected separate unions to be their exclusive collective-bargaining representative in two or more separate units—a result we find incongruous with the policies of the Act."

Two unions, in other words, simply cannot be the "exclusive" bargaining representative of the same employee with respect to the same conditions of employment. There is no question here that employment conditions overlapped at the time the units were chosen. The Regional Director found that all of the employees comprising each of Bentson's crews, including operators, truckdrivers and laborers, functioned together to accomplish the task at hand, working the same hours, receiving the same work breaks, sharing tools, wearing the same type of safety equipment, and attending the same meetings at the jobsite. The Regional Director also found that "[s]ince June 1, 1988, the date by which the Employer asserts that all of its contracts with all unions had expired, all of the Employer's construction employees, including laborers, heavy equipment operators, and truckdrivers, have received the same medical insurance. In addition, since that date, they have all been subject to the terms of the same employee handbook which provides for such matters as holidays, employ-

ment rules, life insurance, and leaves of absence."

The Board argues that "the certification of any union as the exclusive bargaining representative of the employees in that unit makes that union their exclusive bargaining representative only as to their work in that unit" (Resp. Br. at 37). The practical difficulties of this approach are apparent. The "combination" employees would be governed by two collective bargaining agreements during the same working hours. At one moment, when they were handling a shovel, they would be covered by one agreement; at another moment, when they were behind the wheel, a different agreement would control. If such an employee had a grievance regarding work breaks, sick pay, vacations, insurance, work assignments or any other general condition of employment, it is unclear which union should represent him. The employer would constantly face the threat of breaking the law by bargaining with the wrong representative. In addition, there would be significant burdens on the combination employees: they would have to join two unions, pay dues twice, attend two sets of meetings, and somehow split their allegiance apparently on the basis of the type of work they were performing.

For these reasons, the Board has previously rejected the idea of placing dual-function employees in two bargaining units. In *Pulitzer Publishing Co.,* 203 N.L.R.B. 639, 641 (1973), the Board noted the inherent difficulties of having a single employee governed by two agreements—with two unions handling grievances—and agreed with an arbitrator's decision that "[t]his kind of duality seems to be inconsistent with the national labor policy." The Board found that when an employee's actual job overlaps two recognized job categories, "[i]t is not practicable ... to divide the integrated job ... into its separate parts and to assign the different parts to different bargaining units." *Id.* The Board concluded that "[t]he only satisfactory solution is to establish such dual function employ-

ees in separate appropriate units." *Id.*[4]

We fully agree with Professor Gorman's point that "the unit is comprised of jobs or job classifications and not of the particular persons working at those jobs at any given time." R. GORMAN, BASIC TEXT ON LABOR LAW: UNIONIZATION AND COLLECTIVE BARGAINING 66 (1976). But at the initial stage of determining what job classifications belong in what units, the Board must necessarily look to what real employees are actually doing. That is what the Board did in this case. Job classifications are not mere abstractions: they are intimately related to the individuals who occupy the posts. As we have said, more than 70 percent of the employees included in the truckdrivers unit here were also deemed eligible to vote in the laborers unit. By itself, this fact would be a fair indication that the unit composed of "[a]ll truckdrivers, combination truckdrivers, truck mechanics, warehousemen and field servicemen employed by the Employer" did not have a "community of interest" sufficiently distinct from that of the laborers. But the unit definition appears even more capricious in light of its express exclusion of "laborers" from the truckdrivers group. It is difficult to imagine how the Regional Director could have examined all the evidence, found that truckdrivers shared a "community of interest" setting them apart from ordinary laborers, and yet have determined that most of the workers in the truckdrivers unit—which excluded "laborers"-were also in the laborers unit because they performed "substantial general laborer work." The only possible explanation is that the Regional Director gave controlling weight to the fact that in the past, the "combination" employees, referred to Bentson from union hiring halls,

belonged to both the Teamsters and Laborers. But section 9(c)(5) specifically provides that the extent of union organization cannot be given such weight.[5] *See NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 442, 85 S.Ct. 1061, 1063–64, 13 L.Ed.2d 951 (1965).

The Board not only disregarded the substantial overlap of employees resulting from its unit determinations, but erred in a more fundamental way when it included the same job classification—"combination employees"—in two different units. Unit classifications including the same job *categories* in two bargaining units are necessarily at odds with the principle of exclusive representation. To be sure, the Board need not choose the "most appropriate" unit, but simply "an" appropriate unit. *See American Hospital Ass'n v. NLRB*, —— U.S. ——, 111 S.Ct. 1539, 1542, 113 L.Ed.2d 675 (1991). But we hold that placing the same job category in two units, with the distinct possibility that employees will end up having to join two unions to hold one job, cannot be considered appropriate. Since the Board's determinations of the truckdrivers unit and the laborers unit were arbitrary, capricious and otherwise contrary to law, we decline to enforce the Board's orders in *Bentson II* ("Teamsters") and *Bentson III* ("Laborers").[6]

## II

We next consider the unit determination underlying the bargaining order in *Bentson I* ("Operating Engineers"). The Regional Director found that there was a group of employees who spent almost all of their time operating heavy equipment. Although the company presented evidence showing that in the past, heavy equipment

---

**4.** It is not up to this court to determine whether a separate unit composed entirely of "combination" employees would be appropriate in this case; our role is simply to ascertain whether the Board erred in deciding that the units here were appropriate. *See NLRB v. Mercy Hospitals of Sacramento, Inc.*, 589 F.2d 968 (9th Cir.1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 458 (1979).

**5.** "In determining whether a unit is appropriate for the purposes specified in subsection (b) of

this section the extent to which the employees have organized shall not be controlling." 29 U.S.C. § 159(c)(5).

**6.** Bentson also argues that including "combination" employees in two units violates section 9(c)(3) of the NLRA, 29 U.S.C. § 159(c)(3), which prohibits holding successive elections in the same unit or subunit within a period of one year. Because we have denied enforcement of the orders in *Bentson II* and *Bentson III* on other grounds, there is no need to reach this issue.

operators sometimes performed manual labor—and that laborers sometimes operated heavy equipment—Bentson's main contention was that it was trying to institute new working conditions in which these traditional divisions would no longer exist.

After the section 8(f) pre-hire agreements expired, Bentson sought to impose new terms and conditions of employment, which it describes as "radically different from those which had existed prior to May 31, 1988" (Pet. Br. at 6). The new conditions were designed to implement on-the-job employee cross-training. Before the unions filed their petitions, the company distributed a new Employee Handbook to all its construction employees. Among other things, the Handbook stated:

> Bentson will do what is necessary to provide you with available work. Merit shop allows for flexibility and offers you a chance to develop additional skills and to make progress in your career, based on your goals and achievements. We may, for example, ask you to do various types of work on your crew.
>
> . . . .
>
> It is a management goal of Bentson Contracting to develop a following of skilled people who will move from job to job with our company.

As discussed earlier, the Regional Director found that all employees at a given jobsite worked together as a crew, under similar conditions, "to accomplish the job," and that after the expiration of the section 8(f) agreements, they were governed by the same employee handbook.

In determining that the heavy equipment operators comprised an appropriate unit, the Regional Director found that these workers spent nearly all of their time operating heavy equipment such as compaction rollers, scrapers, blades, front end loaders, and sweeping devices called power brooms. Although there was some cross-over in employee job functions, the evidence reveals that it was slight. Ordinarily, operators did not use hand tools or perform laborer tasks, although they would do so in an emergency when a laborer was not available.

Most of the evidence and testimony relied upon by the Regional Director related to past practices. Some of the employees testified about work conditions going back several years. Ordinarily, employment practices over a long period of time would be the best measure of the actual work divisions, and would be a proper means of determining whether employees share a particular "community of interest." But the situation is different when the employer has exercised its prerogative to institute *new* terms and conditions of employment. Then historical practices are less pertinent to the determination of the appropriate bargaining unit.

The question is to what extent the Board may take *past* employment practices into account when a section 8(f) agreement has expired and the employer has instituted different practices for its employees and thereby affected their "community of interest." Section 8(f) was designed to accommodate the particular needs of workers and employers in the construction industry. Because construction workers often move from jobsite to jobsite, they could be denied the benefits of union representation. Employers, on the other hand, need to have an accurate estimate of their labor costs before bidding on projects. *See International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB*, 843 F.2d 770, 772–73 (3d Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988). "In an attempt to satisfy both of these interests, a pre-hire agreement practice developed in the construction industry." 843 F.2d at 773. The Board, however, held that pre-hire agreements violated the NLRA by designating unions to be the exclusive bargaining agents of groups of employees without initial showings of majority support. *Id.*

In 1959, Congress amended the NLRA to provide an exception to this general prohibition. Section 8(f) allows an employer voluntarily to bargain with a union without an initial election or other showing of majority support, an action that would otherwise

constitute an unfair labor practice.[7] *See, e.g., NLRB v. International Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL–CIO,* 434 U.S. 335, 345, 98 S.Ct. 651, 657–58, 54 L.Ed.2d 586 (1978). Section 8(f) agreements were initially treated as preliminary steps on the road to more formal bargaining arrangements. The Board's original view, accepted by the Supreme Court (*International Ass'n of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 98 S.Ct. 651), was that the union's status as exclusive bargaining representative could be challenged during the term of the contract, and that the agreement itself could be repudiated at will by either party. See *R.J. Smith Construction Co.,* 191 N.L.R.B. 693 (1971); *Ruttman Construction Co.,* 191 N.L.R.B. 701 (1971).

In 1987, however, the Board changed its mind and held that a section 8(f) agreement was binding and enforceable for the term of the contract; the employer must continue to bargain with the union for the life of the agreement, unless the employees voted for decertification. *John Deklewa & Sons,* 282 N.L.R.B. 1375, 1385, *aff'd sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB,* 843 F.2d 770 (3d Cir.1988). In *Deklewa,* the Board also held that employers had no duty to continue bargaining or even recognizing unions upon the expiration of section 8(f) agreements; the ordinary presumption that a union continues to enjoy majority support did not apply because there had never been any initial showing of majority support. *Deklewa,* 282 N.L.R.B. at 1386. *See International Ass'n of Bridge, Struc-*

*tural & Ornamental Iron Workers,* 843 F.2d at 772; *see also Hawaii Carpenters' Trust Funds v. Henry,* 906 F.2d 1349, 1355 (9th Cir.1990).

In essence, "the *Deklewa* Board ruled that a § 8(f) pre-hire agreement was to bind the parties for its duration but upon expiration of such a pre-hire agreement, all collective bargaining obligations would cease." *International Ass'n of Bridge, Structural & Ornamental Iron Workers,* 843 F.2d at 778. The employer is then free to establish any terms and conditions it chooses, subject only to the forces of the marketplace. *See System Electric Co.,* 283 N.L.R.B. 650 (1987). If a union later petitions the Board to hold a certification election in an appropriate unit, the Board must therefore look to the new working conditions established after the section 8(f) agreement expired. At that point, past employment conditions do not necessarily reflect current practices and cannot continue to be the best measure of an appropriate unit.[8]

When the section 8(f) agreements lapsed in this case, Bentson established new working conditions emphasizing on-the-job employee cross-training. The company was legally entitled to do so, without having to bargain with any unions regarding this change. Whatever the historical practice may have been, Bentson was within its rights in seeking to establish a single job category composed of "construction employees." The Board must still determine whether there nevertheless are actual divisions in the workforce in terms of job functions, hours of employment, pay

---

7. Section 8(f) states, in part:

   It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged ... in the building and construction industry with a labor organization of which building and construction employees are members ... because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement....
   29 U.S.C. § 158(f).

8. This holds true, of course, only when the section 8(f) agreement has expired and been repudiated. If there is a valid, ongoing, section 8(f) agreement, and a union petitions for certification pursuant to sections 9(c) and 9(e), then the "appropriate unit normally will be the single employer's employees covered by the [8(f)] agreement." *Deklewa,* 282 N.L.R.B. at 1377. *See also P.J. Dick,* 290 N.L.R.B. 150, 151 (1988). In addition, if there has been a previous section 9 agreement, history of collective bargaining is a valid consideration in determining appropriate units, *see Road Sprinkler Fitters Local Union No. 669 v. NLRB,* 676 F.2d 826, 830 (D.C.Cir. 1982).

scales, benefits, and so forth that would justify creating separate units. If such divisions exist—if a certain group of workers share a particular "community of interest" distinct from other employees—then separate units would be appropriate regardless of the label the employer puts on the workforce. But unit determinations must conform to the reality of the situation. Otherwise they are simply arbitrary. If unit determinations are based on functional specializations that do not exist, they must be overturned. When a bargaining unit "determination fails to relate to the factual situation with which the parties must deal, efficient and stable collective bargaining is undermined rather than fostered." *Kalamazoo Paper Box Corp.*, 136 N.L.R.B. 134, 137 (1962); *see also Gustave Fisher, Inc.*, 256 N.L.R.B. 1069 (1981).

Bentson sought to train its employees to perform a multitude of tasks;[9] the Board's unit determinations, on the other hand, are based on discrete functions. The operators unit would confine employees to a single task, contrary to the wishes of the compa-ny, or force the employees in the unit to join two or more unions, with all the attendant practical and legal difficulties already discussed. It is clear that the Board relied heavily on the company's practices under the expired section 8(f) agreements and did not sufficiently take into account the new terms and conditions of employment the company legally sought to institute after it repudiated those agreements. We therefore set aside the Board's determination that heavy equipment operators are an appropriate unit, and deny enforcement of the bargaining order in *Bentson I* ("Operating Engineers").

The petitions for review are granted and the cross-applications for enforcement of the Board's orders are denied.

---

**9.** "The Board has long held that 'the manner in which a particular employer has organized his plant and utilizes the skills of his labor force has a direct bearing on the community of interest among various groups of employees in the plant and is thus an important consideration in any unit determination.'" *Gustave Fisher, Inc.*, 256 N.L.R.B. 1069 n. 5 (quoting *International Paper Co. (Southern Kraft Division)*, 96 N.L.R.B. 295, 298 n. 7 (1951)).