CLEVELAND CONSTRUCTION,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 93–1679.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 5, 1994.

Decided Jan. 24, 1995.

Maurice Baskin, Washington, DC, and Alan G. Ross, Newport Beach, CA, argued the cause and filed the briefs, for petitioner.

Joseph J. Jablonski, Jr., N.L.R.B., Washington, DC, argued the cause, for respondent. With him on the brief were Linda Sher, Acting Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, Washington, DC. Julie B. Broido, Washington, DC, entered an appearance, for respondent.

Before BUCKLEY, GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

This is a petition for review of several rulings rendered by the National Labor Relations Board ("NLRB" or "the Board") in representation proceedings between petitioner, Cleveland Construction, Inc., and the Southwest Ohio District Council of Carpenters, AFL–CIO ("the Union"). Petitioner challenges the Board's finding that a multisite bargaining unit was appropriate, rather than a single-site unit comprised solely of those employed at petitioner's Veterans Administration Hospital project. Petitioner also challenges the Board's conduct of the union election and further proceedings. We find the Board's original determination in favor of the multi-site unit is not supported by substantial evidence. We therefore vacate the Board's decision and do not reach petitioner's other contentions.

## I. BACKGROUND

Cleveland Construction, Inc. ("CCI") is an Ohio corporation with headquarters in the Cleveland metropolitan area. Richard Small is CCI's President. His son Mark Small serves as senior vice president, and Jon Small, his other son, acts as one of several vice presidents. In 1988, CCI established a branch office in Mason, Ohio, for the purpose of expanding its business into Indiana, Ohio, and Kentucky. The Mason office was under the supervision of Jon Small. General field superintendent Cliff Stacey directly reported to Jon Small. Stacey worked out of Mason and was responsible for overseeing and coordinating the various projects within the Cincinnati–Mason area.

In July 1989, CCI commenced work on a Veterans Administration Hospital project ("the VA project") in Dayton, approximately forty miles from Mason. CCI and the Union entered into a pre-hire agreement, negotiated by Mark Small, which affected only those carpenters employed at the VA project. Under such an agreement, permitted by section 8(f) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(f) (1988), a construction industry employer signs a voluntary contract with a union, prior to the commencement of work on a project, covering

the terms of employment on that project. Neither party disputes that under the VA project agreement, the wage rate was generally set higher than wages at other CCI projects within the Mason area, except for wages at the Fernald jobsite. Even at the Fernald site the carpenters did not receive the other benefits received by those carpenters employed at the VA project. In addition, Supervisor Rhett Stayer was assigned as superintendent to oversee the VA project and maintained an office on the hospital project's jobsite in Dayton.

On Dec. 14, 1990, while work was progressing at the VA project, the Union asked the NLRB to conduct an employee representation election with the Board. The Union sought to represent a collective-bargaining unit consisting of all carpenters and apprentice carpenters employed by CCI on all projects within the Union's own geographic jurisdiction, which comprised fifteen counties in southwestern Ohio. Petitioner maintained the only appropriate unit was one limited to the carpenters and their apprentices employed at the VA project in Dayton.

On August 9, 1991, the Acting Regional Director issued a decision and direction of election finding inappropriate both proposals. Rather, he found appropriate a unit composed of carpenters and apprentices employed in petitioner's Mason area operations, and the VA project in Dayton. Petitioner filed a request for review of the Regional Director's unit-scope determination. The Board denied the request for review on September 12, the day before the election.

On March 4, 1993, after affirming a hearing officer's decision resolving several challenges adverse to CCI, the Regional Director issued a Certification of Representative based on the results of the September 13 election. On March 10, 1993, the Union requested CCI to bargain with it respecting wage and working conditions of unit employees. After CCI refused to bargain, the Union filed an unfair labor practice charge with the Board on April 28. On June 1, the Board's General Counsel issued a complaint alleging CCI's refusal to bargain violated the NLRA, 29 U.S.C. §§ 158(a)(1) and (5). CCI responded that the Union's certification was invalid. On August 31, 1993, the Board granted the General Counsel's motion for summary judgment. *Cleveland Construction, Inc.*, 311 N.L.R.B. 1397 (1993).

Finally, on October 8, 1993, CCI filed its petition for review in this court, and on November 22, the Board filed its Cross Application for Enforcement.

## II. DISCUSSION

Petitioner alleges the Board abused its discretion in finding appropriate a multi-site bargaining unit, rather than a unit comprised solely of those carpenters employed at the VA project in Dayton. Section 9(b) of the NLRA, 29 U.S.C. § 159(b) (1988), empowers the Board to "decide in each case whether ... the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof...." The Board need only select an appropriate unit, not the most appropriate unit. *Dezcon, Inc.*, 295 N.L.R.B. 109, 111 (1989). Under NLRB law, the Board first looks to the unit sought by the union. If the unit is appropriate, the Board's inquiry ends. If it finds the union's proposed unit inappropriate, however, the Board will scrutinize the employer's proposal. *Id.* In deciding whether a proposed multi-site unit is appropriate for purposes of collective bargaining, the Board determines whether a community of interests exists among employees at the different sites. The Board considers several factors: (1) the centralization of control of labor relations and supervision, particularly in regard to hiring, discipline, and control of day-to-day operations; (2) the similarity of wages and benefits; (3) the degree of transfer of employees among the employer's other construction sites; (4) the similarity of skills, functions, and working conditions throughout the proposed unit; and (5) the parties' bargaining history.[1] *P.J.*

---

1. Petitioner maintains NLRB precedent compels a presumption favoring single-site bargaining units. The Board contends that this presumption applies only when the union petitions for a single-site unit. *See, e.g., Cleveland Construction, Inc.*, Case No. 6–RC–11087, slip op. at 2 (Reg. Dir. Dec. Aug. 18, 1994); *Penn Color, Inc.*, 249 N.L.R.B. 1117, 1119 (1980). As we decide that

*Dick Contracting, Inc.*, 290 N.L.R.B. 150, 151 (1988); *The Longcrier Co.*, 277 N.L.R.B. 570 (1985).

 The Board is entitled to deference on its selection of an appropriate unit. However, our review must take into account whatever in the record fairly detracts from the weight of the evidence cited by the Board to support its conclusions; we will not merely rubberstamp NLRB decisions. *Synergy Gas Corp v. N.L.R.B.*, 19 F.3d 649, 651 (D.C.Cir. 1994). A bargaining unit determination will not stand if arbitrary and without substantial evidence. *International Bhd. of Elec. Workers, Local 474 v. N.L.R.B.*, 814 F.2d 697, 707 (D.C.Cir.1987). After examining the record as a whole and the arguments of counsel, we conclude that the Board's selection of a multi-site unit including both the VA project and the Mason-area projects is inappropriate. We reach this conclusion because we do not find substantial evidence in the record to support the Board's decision under any of the factors the Board has deemed relevant to the appropriate bargaining unit inquiry.

*A. Centrality of Control of Labor Relations*

 As to the first factor, centrality of control over the VA project in Dayton and the projects in the Mason area, the Regional Director, affirmed by the Board, found the labor policies and day-to-day control for all the projects were set by petitioner's vice president Jon Small and the Mason area general field superintendent Cliff Stacey. The record, however, does not support this finding as to the VA project. Stacey testified without contradiction that he had no involvement in or knowledge of the VA project. In fact, Rhett Stayer was assigned as superintendent to oversee this project. Stayer, himself, hired and fired employees, and also handled billing, scheduling, and quality control. The record shows Stayer supervised no other projects within the Mason area while working at the VA project.

 The Board points to two statements in Stayer's testimony to the effect that he did

report to Jon Small, who oversaw several projects within the Mason area, and whose field superintendents had responsibility for hiring and firing employees at those projects. True, these statements, taken out of context, would seem to support a finding that some common control existed between the VA project and the others. But, for the centrality of control test to have any useful content, it must require something more than a joining of corporate lines of responsibility at some point higher than the immediate supervisors of the components of the multi-site unit under consideration. It would be a useless formula if it could be met for example simply by the fact, presumably present in every case, that the labor supervisors of each component part reported ultimately to the employer's chief operating officer or chief executive officer. The more specific evidence in this case is not consistent with a conclusion that Jon Small represented a centrality of control over labor matters—such as hiring, firing, grievances, etc.—over both the Mason area and VA projects.

First, Stayer never explained the exact nature of his communications with Jon Small. In fact, Jon Small, himself, testified he had no responsibility for overseeing the VA project. Rather, he stated Stayer directly reported to Mark Small who oversaw the project. Jon Small explained Mark Small oversaw the project because "It's a very large job force and it's being handled out of our Mentor office." In addition, Stayer, himself, testified he also reported to Mark Small, and that Mark Small handled grievance procedures concerning the VA project. In contrast, Stayer never discussed Jon Small's actual relationship with the project. In any event, Stayer asserted he rarely even reported to either Small. Thus, there is insufficient evidence of central control over the projects to provide any support for the Board's decision.

*B. Similarity of Wages and Benefits*

 As to the second factor, the evidence also fails to support the Board's con-

the Board's certification of the larger unit is erroneous even without the presumption, we

need not address the breadth of its application.

clusion. The evidence is undisputed that the pay levels were different, whether because of the terms of the pre-hire agreement negotiated by Mark Small at the VA hospital project as contrasted with the compensation parameters set by Jon Small on other projects, because of the nature of the VA hospital as a prevailing wage job, or because of the differing skill level involved in the two kinds of projects. Only at the Fernald job site did employees receive direct wages approaching those at the VA job, and even there the employees did not receive the same benefits as the VA project employees. Not only does the evidence on similarity of wages and benefits not provide support for the unit's appropriateness, to the extent that it reflects upon the differences in supervision, skills of workers, and working conditions at the two sites, it undermines the other bases for the Board's ultimate erroneous conclusion.

## C. Similarity of Skills, Functions, and Working Conditions

 The Regional Director found that "[c]arpenters perform the same duties and utilize the same skills and equipment regardless of the job to which they are assigned." However, this part of the test, like the centrality of control factor, has meaning only in proportion to its level of specificity. It cannot be that merely being members of the same craft is enough to meet this criterion of the test, or the criterion is meaningless. Any bargaining unit of carpenters would be appropriate for the construction employer no matter how otherwise inappropriate or even absurd that unit might be. The Director's decision, as adopted by the Board, ignores the substantially uncontested evidence that the VA project required a much higher level of mastery of carpentry skills than required elsewhere.

For example, Jon Small testified that the VA project necessitated different employee requirements than those projects under his own supervision, and that the VA project was very difficult, requiring more mechanical work than at other sites. Rhett Stayer testified that "[t]his is probably the most difficult drywall hanging job that you're going to encounter." Such a job required the use of a screw gun. Stayer said employees at the VA project had to be more efficient and faster with screw guns than elsewhere. Thus, he could only rely on the best people available. Likewise, Stayer said framing was more difficult at the VA project. Similarly, those carpenters that performed ceiling tile work had to be better skilled and quicker than their counterparts on other projects.

Consequently, Stayer testified that it was quite difficult for employees arriving at the VA project from other sites to handle their new responsibilities, again, undermining the Board's conclusion.

## D. Transfer Among Jobsites

 In support of his conclusions, the Regional Director found that carpenters were frequently transferred between the various jobsites. However, the record shows that while a great degree of transferring occurred among employees at sites other than the VA project, almost none transferred to and from the VA project itself. For instance, Cliff Stacey testified that while he had no knowledge of the VA project, a significant core of employees transferred between other sites. He also stated that employees would be transferred from job to job if sites were closing down. Likewise, Jon Small testified he would move qualified employees between the projects under his supervision.

In contrast, the record reveals a minimal number of successful transfers of employees to and from the VA project. One employee, Rich Reynolds, transferred from Columbus to the VA project and back to Columbus. Two other employees, Ricky Barker and Mike Eisen, were transferred to the VA project, but could not handle the difficulty of their new positions. They were subsequently terminated.

According to Stayer, Barker's work required a lot of corrections. On a prevailing wage job like the VA hospital, he could not afford to pay Barker to perform the job twice. Similarly, Mike Eisen came from a different project to the VA job and was subsequently released because his hanging of dry wall was "very un-neat and it was very hard to finish." Finally, Stayer took some of his employees from the Governors Hill pro-

ject and placed them at the VA project. However, only one, Mike Wilkin, lasted, and the record shows his future at the project was in doubt. Stayer stated Wilkin worked well with acoustics, but was not competent at other functions. Thus, his employment at the project was continued only so long as acoustical work existed. No contrary evidence exists of the routine assignments of workers from other job sites to the VA project who were competent to handle their new positions.

██ Concerning transfers from the VA project to other projects the evidence is likewise not supportive of the Board's conclusion. Two employees, Gary Sparks and William Allen, asked to be transferred from the VA project (apparently when it was winding down) to Fernald. That petitioner granted that limited request for transfer away from the project subject to a pre-hire agreement to one of the uncovered projects, is not substantial evidence to support the Board's conclusion that the covered project is an appropriate component of the general unit.

### E. Bargaining History

██ Finally, the bargaining history of petitioner and the Union offers strong support for petitioner's position, not respondent's. Petitioner relies on Board law holding where, as here, an employer and union have previously entered a "pre-hire" project agreement as permitted under section 8(f) of the NLRA, the Board should normally find appropriate the unit covered by the 8(f) agreement. *John Deklewa & Sons, Inc.*, 282 N.L.R.B. 1375 (1987), *enf. sub nom., International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. N.L.R.B.*, 843 F.2d 770 (3d Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988); *P.J. Dick Contracting*, 290 N.L.R.B. at 151. However, the Board appeared to qualify this language in *Dezcon, Inc.*, 295 N.L.R.B. at 112. In *Dezcon*, the Board rejected the employer's contention that the trend of entering project-by-project agreements constituted determinative bargaining history under *Deklewa*. Specifically, the Board asserted "The Board's remarks on unit scope in *Deklewa* should not be interpreted so as to rob construction in-

dustry employees of meaningful choice, simply because an employer has unilaterally decided to limit its relations with craft unions to project agreements." *Id.*

The Board maintains in its brief that *Deklewa* held a single-site unit previously covered by an 8(f) pre-hire agreement is only presumptively appropriate where the union seeks to represent the single-site unit itself (Respondent's Brief at 17–18). Accordingly, *Deklewa* does not limit bargaining units in the construction industry to single-site units covered by pre-hire agreements, where the union instead petitions the Board for a multi-site unit. Thus, the Board asserts *Dezcon* did not undermine the holding in *Deklewa* because *Dezcon* merely held a multi-location unit could be found appropriate where the union is not seeking to represent a project covered by a pre-hire agreement.

██ The Board's opinion in this case, however, is completely silent on the relationship between *Deklewa* and *Dezcon*. The agency is not free to ignore its precedent without explanation. *Michigan Consol. Gas Co. v. FERC*, 883 F.2d 117, 122 (D.C.Cir. 1989). The Board's precedent from *Dezcon* sets forth the multi-factor test including the parties' bargaining history as one factor. *Deklewa* is precedent for the importance of the prior established 8(f) unit. If the Board does not ignore these precedents, then it must explain why they do not, both singly and together, impel a finding that the single-site unit suggested by CCI is the appropriate one. We do not suggest that they compel an ultimate conclusion to that effect, but we cannot uphold silence. The Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1988), requires us not to set aside agency action unless it is arbitrary and capricious. The Board's silent departure from precedent and its ignoring of evidence on this and other factors of the precedentially dictated test compel us to set aside the Board's action in this case.

### III. CONCLUSION

For the foregoing reasons, we grant the petition for review, deny the application for enforcement, and vacate the Board's adop-

tion of the Regional Director's August 9, 1991 decision, finding appropriate a unit composed of carpenters and apprentice carpenters employed in petitioner's Mason area operations, including the VA project in Dayton. As a result, we have no need to reach petitioner's other contentions.