Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 21, 2003          Decided April 25, 2003

No. 01-1353

RC ALUMINUM INDUSTRIES, INC. AND
RC ERECTORS, INC.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

*Harry N. Turk* argued the cause and filed the briefs for petitioners.

*Meredith L. Jason*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*,

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Sharon I. Block*, Attorney.

Before: GINSBURG, *Chief Judge*, and SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: This petition for review raises several issues arising from an attempt by two local chapters of a union—Local Union No. 272 and Shopmen's Local Union No. 698 of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, AFL–CIO—to represent employees at the companies in a double-breasted operation.[1]

One of the companies, RC Aluminum Industries, Inc. ("RCA"), incorporated in 1990, is headquartered in Miami. RCA fabricates windows, doors, and handrails at production facilities in Miami, transports them to high-rise construction projects throughout Florida, and installs them at the sites. Among the workers at RCA are about 80 production and maintenance employees working in the Miami facilities and about 140 installers working throughout the State.

The other company, RC Erectors, Inc. ("RCE"), incorporated in 1998, has the same Miami headquarters and is managed by the same officers as RCA. RCE was created after RCA's president, Raul Casares, learned of an installation job for which only signatories to union collective bargaining agreements could bid. RCA had no such agreement. Once, in 1993, it had entered into a prehire agreement[2] with

---

[1] A double-breasted operation consists of affiliated union and nonunion firms that allow a contractor to compete for both union and nonunion work. *See Rd. Sprinkler Fitters Local Union No. 669, United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada, AFL–CIO v. NLRB*, 789 F.2d 9, 12 n.2 (D.C. Cir. 1986); *Local 627, Int'l Union of Operating Eng'rs, AFL–CIO v. NLRB*, 595 F.2d 844, 845 n.1 (D.C. Cir. 1979).

[2] A prehire agreement results from an employer's voluntary bargaining with a union without an initial election or other showing

Local 272, but that agreement covered only installers at a particular site and expired by its terms later the same year. Thereafter, Local 272 occasionally referred workers to RCA, and RCA gave those workers the wages and benefits specified in the expired agreement.

After its incorporation, RCE signed a comprehensive pre-hire agreement[3] with the union (Local 272 and another local not involved in this case), bid, and got the job. RCE employs about 80 installers at scattered Florida sites. It does not produce or transport its own products; it installs products made and transported to its sites by RCA and other companies.

The events precipitating this litigation began on May 10, 2000, when Locals 272 and 698[4] petitioned the National Labor Relations Board to certify them as the joint representative of RCA and RCE employees. The proposed bargaining unit[5] consisted of RCA's production and maintenance employees, RCA's installers, and RCE's installers. After a hearing, the Board's regional director (1) determined that RCA and RCE, though formally separate, were a single employer for purposes of the National Labor Relations Act, and (2) rejected the locals' proposed unit, deciding instead that two units—one

of majority support. *See Bentson Contracting Co. v. NLRB*, 941 F.2d 1262, 1268–69 (D.C. Cir. 1991). Such bargaining would be an unfair labor practice but for 29 U.S.C. § 158(f), which permits prehire agreements in the construction industry. *See Bentson*, 941 F.2d at 1268–69.

[3] The agreement was not limited to any particular project, although it was set to expire on September 30, 2000.

[4] Local 272 is an "outside shop," meaning that it traditionally represents workers in the field. Local 698 is an "inside shop," traditionally representing workers in plants.

[5] "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." 29 U.S.C. § 159(a).

of RCA's production and maintenance employees (Unit A), and the other of both RCA's and RCE's installers (Unit B)—were appropriate. The regional director ordered an election in each unit in which employees could vote for or against joint representation by the two locals. The companies requested review of the decision, but the Board rejected their request in a brief order, stating that there were "no substantial issues warranting review." The elections went forward and the locals won both. On November 9, 2000, the regional director certified them jointly as the exclusive collective bargaining representative of each unit. The locals requested bargaining on behalf of both units; the companies refused to bargain; the locals filed an unfair labor practice charge; and the Board ordered the companies to bargain on the grounds that their refusal violated § 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1), (5). The companies then sought judicial review. The Board cross-petitioned for enforcement.

As to the representation proceeding, RCA and RCE complain that the regional director's single employer finding was unnecessary; that in any event they are not a single employer; and that their installers do not belong in a single bargaining unit.

Contrary to the companies' argument, the single employer determination was necessary. Section 9(b) of the Act authorizes the Board to "decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the *employer unit, craft unit, plant unit, or subdivision thereof*." 29 U.S.C. § 159(b) (emphasis added). This language does not expressly sanction bargaining units composed of employees of multiple employers. If anything, it suggests that such units are impermissible. *See NLRB v. L.B. Priester & Son, Inc.*, 669 F.2d 355, 359 (5th Cir. 1982). Nevertheless the Board has long construed "employer unit" to allow them, *Int'l Bhd. of Elec. Workers, Local Union No. 68, AFL–CIO v. NLRB*, 448 F.2d 1127, 1128 n.3 (D.C. Cir. 1971), and multi-employer bargaining is well-established, *Brown v. Pro Football, Inc.*, 518 U.S. 231, 240 (1996).

The Board, however, approves multi-employer bargaining only when employers participate voluntarily. *See Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 412 (1982); *Int'l Union of Elec., Radio & Mach. Workers, AFL–CIO–CLC v. NLRB*, 604 F.2d 689, 695 n.14 (D.C. Cir. 1979). RCA and RCE certainly have not agreed, explicitly or implicitly, to participate in multi-employer bargaining. Therefore the regional director could approve a bargaining unit including both companies' employees only after determining that the companies constituted a single employer.

In deciding whether RCA and RCE were integrated enough to be considered a single enterprise, the Board examined several indicia: (1) common management; (2) centralized control of labor relations; (3) interrelation of operations; and (4) common ownership or financial control. *Naperville Ready Mix, Inc.*, 329 N.L.R.B. 174, 179 (1999). *See also Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965). Not all four criteria must be satisfied for the Board to find a single employer. *See Local No. 627, Int'l Union of Operating Eng'rs, AFL–CIO v. NLRB*, 518 F.2d 1040, 1045–46 (D.C. Cir. 1975), *aff'd in relevant part sub nom. South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs, AFL–CIO*, 425 U.S. 800, 806 (1976). Here, the regional director found, among other things, that RCA and RCE share the same officers; that President Casares was in charge of dealing with the union on behalf of both RCA and RCE; that RCA manufactured products for RCE's primary project to date and transported them there; and that RCA made some fringe benefit payments on behalf of RCE. The record supports all of these findings. The companies' only significant contrary argument is that there was insufficient evidence to establish central control of labor relations. But the business manager of Local 272 testified at the representation hearing that he had dealt exclusively with President Casares on matters relating to collective bargaining agreements with both RCA and RCE. The regional director's conclusion that RCA and RCE were a single employer therefore rested on substantial evidence.

It does not necessarily follow that an employer-wide bargaining unit of installers was appropriate. *See South Prairie*, 425 U.S. at 805. In making such determinations pursuant to § 9(b), the Board considers whether the employees share a "community of interest." A host of factors influence the Board's judgment in this regard. *See Deferiet Paper Co. v. NLRB*, 235 F.3d 581, 583 (D.C. Cir. 2000); *Bentson Contracting Co. v. NLRB*, 941 F.2d 1262, 1265 (D.C. Cir. 1991). When the proposed bargaining unit covers multiple worksites, as here, the Board pays some extra attention to the consistency of employees' interests across different sites. The Board thus considers skills and duties; wages and benefits; interchange between sites; functional integration; geographic proximity; centralized control of management, supervision, and labor relations; and bargaining history. *See Cleveland Constr., Inc. v. NLRB*, 44 F.3d 1010, 1013 (D.C. Cir. 1995); *Alley Drywall, Inc.*, 333 N.L.R.B. No. 132, 2001 WL 400276, at *4 (Apr. 17, 2001); *Alamo Rent–A–Car*, 330 N.L.R.B. 897, 897 (2000); *P.J. Dick Contracting, Inc.*, 290 N.L.R.B. 150, 151 (1988). Once again, no particular factor controls. *See Bentson*, 941 F.2d at 1265.

Given the fact-intensive nature of these decisions, the Board has wide latitude in determining an appropriate bargaining unit. *See, e.g.*, *NLRB v. Action Automotive, Inc.*, 469 U.S. 490, 494 (1985). As is frequently observed, the Board need not choose the most appropriate unit, but simply an appropriate unit. *See, e.g.*, *Cleveland Constr.*, 44 F.3d at 1013. Nonetheless, the Board's decision must be consistent with its precedent, and its factual findings must be supported by substantial evidence. *See id.* at 1014.

Here the regional director acknowledged that one factor—bargaining history (RCE's sustained history of operating under a comprehensive prehire agreement, in contrast with RCA's limited adoption of a single, project-specific agreement and occasional application of its terms after expiration)—cut against combining the companies' installers in a single unit. But she decided that other factors—the companies' installers did the same kind of work, and all the installers worked

under centralized management—outweighed the bargaining history.

RCA and RCE believe the regional director should have approved separate units of each company's installers. They rely largely on *Cleveland Construction*, in which we rejected a unit determination because of lack of substantial evidence and because the Board had not explained how its decision could be squared with its precedents. *Id.* at 1014–16. Neither of the companies objects to the regional director's finding that installers at RCA and RCE did the same type of work. This contrasts with *Cleveland*, in which the evidence supported none of the community-of-interest factors. *Id.* at 1014. The companies believe the regional director's finding on another factor—centralized management—is unfounded. It is true, as we explained in *Cleveland*, that the centrality-of-control test requires more than merely some "joining of corporate lines of responsibility at some point higher than the immediate supervisors" at various sites. *Id.* If nothing more were required, the test would be meaningless; local supervisors are ultimately responsible to top management. *Id.* What is required is some evidence that day-to-day labor decisions such as hiring, firing, and grievance handling were centrally controlled.

In this case, each site (both RCA's and RCE's) had one or more foremen with authority to hire, fire, and discipline installers. All the foremen (both RCA's and RCE's) reported to a general installation superintendent, Juan Encinosa, who visited the jobsites on a daily basis, had hiring and firing authority, and coordinated installer hiring with a personnel director. This evidence adequately supports the centralized supervision finding.

The companies also argue, again on the basis of *Cleveland*, 44 F.3d at 1014–16, that the wages and benefits of RCA's and RCE's installers were not similar; that installers were rarely, if ever, transferred between RCA's and RCE's sites; and that these considerations defeat any possible community of interest between RCA's and RCE's installers. RCA did pay most of its installers (with the exception of a few installers referred

to RCA by the union) lower wages than RCE paid its workers under the prehire agreement, and RCA's installers received fewer benefits than RCE's installers received under the agreement. It is also correct that the evidence of installer transfer between RCA and RCE is scant. All the record shows is that five RCE employees were employed by RCA before they worked for RCE. These facts may establish that separate units of RCA installers and RCE installers, or separate units of the installers at each jobsite, would have been appropriate. But that does not undermine the regional director's conclusion, in light of the similarity of the installers' work and their common supervision, that a unit of all the installers was appropriate.

The companies believe the regional director did not sufficiently explain why she accorded little weight to RCA's and RCE's disparate bargaining histories. In *Cleveland* we noted that Board precedent conflicts on how much weight bargaining history should carry in the decision whether to certify a multi-site bargaining unit. *Id.* at 1016. The Board at one time had ruled that in processing representation petitions the appropriate unit "normally will be the single employer's employees covered by [a preexisting prehire] agreement." *P.J. Dick Contracting*, 290 N.L.R.B. at 151 (quoting *John Deklewa & Sons, Inc.*, 282 N.L.R.B. 1375, 1377 (1987)). But later it qualified this position, stating that the "Board's remarks on unit scope in *Deklewa* should not be interpreted so as to rob construction industry employees of meaningful choice, simply because an employer has unilaterally decided to limit its relations with craft unions to project agreements." *Dezcon, Inc.*, 295 N.L.R.B. 109, 112 (1989). In *Cleveland* we faulted the Board for its silence regarding how these precedents affected its decision. 44 F.3d at 1016. Here the regional director's discussion of the Board's precedents was sufficient, although cursory. The regional director quoted *Dezcon*'s discussion of *Deklewa* and relied on it for the proposition that bargaining history was not conclusive in determining the scope of the unit—in other words, other community-of-interest factors could outweigh bargaining history.

In short, the regional director chose an appropriate unit. The possibility that separate units of installers at RCA and at RCE might also have been appropriate does not render the decision erroneous.

The companies' last contention is that the local unions failed to make a valid demand for joint bargaining, and thus the companies did not "refuse to bargain" within the meaning of § 158(a)(5). *See AT Sys. West, Inc. v. NLRB*, 294 F.3d 136, 139–40 (D.C. Cir. 2002). The contention rests on the following post-election events. On November 9, 2000, the regional director (1) certified both locals as the joint representative of the production and maintenance employees (Unit A) and (2) certified both locals as the joint representative of the installers (Unit B). Shortly thereafter, the locals sent several letters to RCA's officials (and thus RCE officials) and the companies' attorney.

Local 698, in a November 20 letter on its letterhead, claimed to be the "sole collective bargaining agent" of Unit A and requested information (regarding wages and other matters, needed to prepare a negotiating position) about those particular employees. Local 272, in a separate November 20 letter on its own letterhead, claimed to be the "sole collective bargaining agent" of Unit B and requested necessary information about those employees. The locals repeated their requests the next month, using similar language. In its letter of December 15, 2000, Local 698 referred to itself as "the sole collective bargaining agent of your production and maintenance employees" and requested information regarding those employees. In its letter of December 19, 2000, Local 272 referred to itself as "the sole collective bargaining agent of your erector employees" and requested information regarding those employees.

The companies responded in a December 21 letter to the President of Local 272, stating: "We believe that the Regional Director's unit determination . . . and the finding of single employer status were incorrect . . . and RC Aluminum intends to exercise its right to seek judicial review of that ruling. Accordingly, . . . we must respectfully decline to

engage in any collective bargaining." The letter mentioned neither Local 698 nor any objection to the validity of either local union's bargaining requests.

Apparently apprised of the companies' refusal to bargain with Local 272, Local 698, in a letter dated January 19, 2001, referring to itself as "the representative" of Unit A, asked whether the refusal applied to it as well, and requested that negotiations begin immediately. The companies' attorney replied in a February 2 letter, addressed only to Local 698, reiterating RCA's intent "to seek judicial review of the Regional Director's determination." The letter also raised the sufficiency of the request for the first time by stating that Local 698's "letter [did] not appear to be a valid request to commence negotiations."

The local unions filed an unfair labor practice charge with the regional director on February 14, alleging that RCA and RCE, as "a Single Employer," had "refus[ed] to bargain . . . with the Union." The charge listed the charging party as "L.U. #272 and #698 Int'l Assoc. of Bridge, Structural, Ornamental & Reinforcing Ironworkers, AFL–CIO." Kevin Wallace, President of Local 272 and District Representative of Local 698, signed the charge on behalf of both locals. The charge was served on President Casares the day after it was filed. Later that month (on February 26), the companies sent a letter to the Board stating that they were "challeng[ing] the underlying certification of the labor organizations involved." The letter said nothing about the bargaining request issue.

The next month (on March 8), the regional director issued a complaint. The complaint alleged in part that "the Union" (meaning both locals collectively) had requested bargaining "as the exclusive collective-bargaining representative" of Unit A, and made the same allegation regarding Unit B. The companies denied these allegations in their answer, filed March 23. In further proceedings before the Board, the companies contended that the locals intended to bargain separately on behalf of the units, so that the complaint should be dismissed and the unit determination overturned.

In sustaining the refusal-to-bargain charge, the Board assumed that the letters alone would not have been sufficient bargaining demands. But the Board held that the February 14 charge, filed jointly by the local unions and signed by a person acting on behalf of both locals, dispelled any confusion the letters might have created. Together, the earlier letters and the charge, according to the Board, constituted a valid demand.

We see no basis for upsetting the Board's judgment. The letters raised doubts about the local unions' intent to bargain jointly.[6] *See Suburban Newspaper Publ'ns, Inc.*, 230 N.L.R.B. 1215, 1217 (1977); *Automatic Heating & Serv. Co.*, 194 N.L.R.B. 1065, 1065 (1972). But the joint charge cleared up these doubts. The Board's ruling is consistent with its precedent. A line of Board cases holds that the filing of an unfair labor practice charge may cure an inadequate request and give rise to a valid bargaining demand. *See, e.g., Parkview Manor*, 321 N.L.R.B. 477, 477 (1996), *overruled in part on other grounds by Grancare, Inc.*, 331 N.L.R.B. 123 (2000). *See also NLRB v. Williams Enters., Inc.*, 50 F.3d 1280, 1286–87 (4th Cir. 1995) (citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 53 (1987)). *Cf. Patent Office Prof'l Ass'n v. FLRA*, 872 F.2d 451, 455–56 (D.C. Cir. 1989). We do not go so far as saying that a charge alone could constitute a valid demand. As the Board noted, the companies repeatedly indicated that they intended to trigger the charge in order to contest the unit determination. No matter how clear the bargaining demand, it would have been futile. *See Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 314 (D.C. Cir. 2003).

---

[6] The companies also argue that the letters were defective demands in other respects—that they failed to propose a specific time and place or particular topics for bargaining. We decline to reach this argument because the companies raised it neither before the Board, *see* 29 U.S.C. § 160(e), nor before us until their reply brief, *see, e.g., Rollins Envtl. Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991).

The petition for review is denied and the Board's cross-petition for enforcement is granted.

*So ordered.*