**SPEEDRACK PRODUCTS GROUP, LTD., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 96–1309.

United States Court of Appeals, District of Columbia Circuit.

Argued April 3, 1997.

Decided June 20, 1997.

C.V. Stelzenmuller, Birmingham, AL, argued the cause and filed the briefs for petitioner.

Sharon I. Block, Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Linda Dreeben, Supervisory Attorney, were on the brief.

Before: EDWARDS, Chief Judge, WALD and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Speedrack Products Group, Ltd. ("Speedrack") petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board") holding that Speedrack violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(1), 158(a)(5) (1994), by refusing to bargain with the United Steelworkers of America, AFL–CIO–CLC ("Union"), after the Union had been certified as the exclusive representative of all production and maintenance employees at Speedrack's Hamilton, Alabama facility. Speedrack argues that the Board erred in finding that four work release inmates employed at the facility were ineligible to vote in the representation election. The Board cross-petitions for enforcement of its order.

We conclude that the Board's exclusion of the work release inmates from the bargaining unit was unreasonable because it ignored past Board decisions holding that whether work release inmates are eligible to vote in representation elections turns on their status while in the employee relationship, and not on restrictions to which they may be subject at other times. Accordingly, we grant Speedrack's petition for review, reverse the Board's order and deny the Board's cross-petition for enforcement of its order. We remand for the Board to reconsider its decision in light of its precedent. If on remand the Board decides that the work release employees are eligible to vote in the representation election, the Board also should determine whether the Union is the exclusive bargaining representative when the ballots of the work release employees are included and, if not, whether the election results should be set aside and a new election held.

## I. BACKGROUND

Speedrack, which manufactures storage racks and shelving at its Hamilton facility,

participates in a work release program administered by the Alabama Department of Corrections ("DOC"). Under this program, Speedrack employs individuals at its Hamilton facility who are inmates at the DOC's work release center in Hamilton. These work release inmates perform the same duties, are paid the same wages, and receive the same benefits as other employees. The DOC transports the inmates to Speedrack's facility and back to the work release center, and they are required to return to the center whenever they are not working. Paychecks are made out jointly to the DOC and the inmates, they are required to work overtime when asked, and the DOC can remove an inmate from Speedrack's employment if it receives complaints about the inmate's behavior. The DOC can also discipline work release inmates if they engage in misconduct when working or if they quit their jobs without good cause.

In May, 1991 the Union filed a petition seeking a representation election for a unit composed of all production and maintenance employees at Speedrack's Hamilton facility. An election was held on July 21, 1991, pursuant to a stipulated election agreement, and resulted in 56 votes for the Union, 51 against, with eight ballots challenged by the Union. At the time of the election, four inmates in the work release program were employed at Speedrack as production and maintenance employees, and four of the ballots that the Union challenged were the ballots cast by these employees. The Union also filed twelve objections to the election claiming that Speedrack had engaged in illegal conduct during the election period.

A hearing on the Union's ballot challenges and claims of illegal conduct was held on October 9–10, 1991, before a Board Hearing Officer. On October 31, 1991, the Hearing Officer issued a report finding that the work release employees were eligible to vote in the election. *Hearing Officer's Report on Objections and Challenged Ballots,* Case10–RC–14124, Joint Appendix ("J.A.") tab 3 at 23–26. As a result, the Hearing Officer rejected the Union's challenge to the four ballots cast by the work release employees. The report also rejected the Union's four other ballot chal-

lenges, but sustained four of the Union's allegations of illegal conduct by Speedrack.[1] The Hearing Officer recommended that the Union be certified as the exclusive bargaining representative of the unit if it had a majority once all the challenged ballots were counted, and that otherwise the results of the election should be set aside and a new election held.

The Union filed exceptions to the Hearing Officer's conclusions on six of the challenged ballots, including the Hearing Officer's decision that the ballots of the four work release employees should be counted because these employees were eligible to vote in the election. On December 29, 1995, the Board unanimously affirmed the Hearing Officer's conclusions regarding the non-work release employees whose ballots had been challenged by the Union and the Union's objections to Speedrack's conduct. *Speedrack Prods. Grp. Ltd.*, 320 N.L.R.B. 627, 627 n. 2, 629, 1995 WL 791139 (1995) (*Speedrack I*).[2] By a 2 to 1 vote, however, the Board reversed the Hearing Officer's conclusion that the work release employees were eligible to vote in the election. The Board majority found that the work release employees' inclusion in the unit would be inappropriate because, unlike other employees, the work release employees had to return promptly to the work release center when not working and were subject to prison discipline if they refused to work overtime, engaged in misconduct or arguments at work, or quit without good cause. *Id.* at 628–29. Chairman Gould, in dissent, argued that none of these differences was significant under the Board's precedent and that the only potentially significant factor separating work release employees and other employees was a DOC policy prohibiting work release employees from joining unions, but he concluded this policy was preempted by the NLRA.[3] *Id.* at 629–30.

As the vote after the Board's disposition of the Union's challenges was 56 to 55 in favor of the Union, the Board certified the Union as the exclusive bargaining representative of the unit employees. *Id.* at 629. The Board subsequently, without dissent, rejected Speedrack's motion for reconsideration. The Union then requested that Speedrack recognize and bargain with the Union. When Speedrack refused to do so, the Union filed an unfair labor practice charge against Speedrack and the Board issued an order holding that Speedrack had committed an unfair labor practice, in violation of sections 8(a)(5), 8(a)(1), 2(6) and (7) of the NLRA, by refusing to bargain. *Speedrack Prods. Grp., Ltd.*, 321 N.L.R.B. No. 143, 1996 WL 482924 (Aug. 23, 1996) (*Speedrack II*). Speedrack now appeals this order, arguing that its refusal to bargain was justified because the Board erred in sustaining the Union's challenges to the ballots of the work release employees.

## II. ANALYSIS

■ An employee is eligible to vote in a representation election if she shares "a community of interest" with the other employees in the unit. The Board examines various factors to determine if a community of interest exists, such as the similarity of wages, benefits, skills, duties, working conditions, and supervision of the employee, but " 'there are no per se rules to resolve unit determinations.' " *Skyline Distribs. v. NLRB*, 99 F.3d 403, 407 (D.C.Cir.1996) (quoting *Bentson Contracting Co. v. NLRB*, 941 F.2d 1262, 1265 (D.C.Cir.1991); *accord Cleveland Constr., Inc. v. NLRB*, 44 F.3d 1010, 1013 (D.C.Cir.1995)). The Board exercises broad discretion in making unit determinations, and its unit determinations are accorded particular deference by a reviewing court. *See BB&L, Inc. v. NLRB*, 52 F.3d 366, 369

---

1. Specifically, the Hearing Officer sustained the Union's claims that, in violation of the NLRA, Speedrack had interrogated and harassed its employees, disciplined employees for engaging in protected activity, threatened to not recognize the Union, and refused to allow pro-union literature to be posted on a bulletin board used for other personal communications among employees. *See Hearing Officer's Report*, J.A. tab 3 at 31–35, 37–42.

2. These parts of the Board's decision have not been challenged on appeal.

3. Because Chairman Gould concluded that any policy prohibiting work release inmates from joining unions would be preempted, he did not determine whether in fact such a policy existed. *See Speedrack I*, 320 N.L.R.B. at 629–30 & n. 4.

(D.C.Cir.1995); *Cleveland Constr.,* 44 F.3d at 1013–14. This deference is not without limits, however, and in particular "the Board cannot ignore its own relevant precedent but must explain why it is not controlling." *BB&L, Inc. v. NLRB,* 52 F.3d at 369.

■ Unfortunately, the Board did precisely that in this case; it ignored its own precedent without offering any explanation as to why this precedent was inapplicable. In *Winsett–Simmonds Engineers, Inc.,* the Board addressed the same question at issue here, namely whether work release employees shared a community of interest with other employees such as to make them eligible to vote in a representation election. The Board stated in *Winsett–Simmonds* that the "test as to whether an employee shares a community of interest with his fellows so as to be included in a unit with them depends on his status while in the employment relationship and not what ultimate control he may be subjected to at other times." 164 N.L.R.B. 611, 612 (1967). The Board concluded that the work release employees in *Winsett–Simmonds* shared a community of interest with the other employees in the unit because they were treated the same as other employees while at work; they worked side-by-side with the other employees, were paid the same wages, received the same benefits, and were assigned to work teams in the same fashion. Although the work release employees were subject to prison restrictions that did not apply to the other employees, the Board held that these differences were either unimportant because they did not affect the employees in their status as employees or were outweighed by the similarities between work release and other employees. *Id.* at 611–12.

The Board reached similar conclusions in two subsequent cases where work release employees were treated similarly with other employees while on the job. In *Georgia–Pacific Corp.* the Board followed *Winsett–Simmonds* and held that "the critical test is that an employee's community of interest with his fellow employees depends on his status while in the employment relationship and not on what ultimate control he may be subject to at other times." 201 N.L.R.B. 760,

761 (1973). Since "the record reveal[ed] an almost total assimilation of the [work release] employees into the Employer's production and maintenance work force," *id.,* with the work release employees sharing the same hours, wages, promotion opportunities, supervision, and work assignments as the other employees, the Board had little difficulty concluding that a substantial community of interest existed. *Id.* The Board once more adhered to the *Winsett–Simmonds* test in its decision in *Rosslyn Concrete Constr. Co.,* which was later enforced by the Fourth Circuit. *See* 261 N.L.R.B. 732 (1982), *enf'd,* 713 F.2d 61 (1983). In *Rosslyn* the Board held that a community of interest existed because the work release employees worked side-by-side with other employees, shared the same working conditions and received identical benefits. The Board specifically found no significance in the fact that prison authorities could monitor the work release employees and end their employment because it did not "interfere with [the employer's] operation or affect the employee during the day." *Rosslyn,* 713 F.2d at 64.

The only case where the Board has held that a community of interest did not exist between work release and other employees is a pre-*Winsett–Simmonds* decision, *National Welders Supply Co., Inc.* But in *National Welders* the status of work release employees at work was substantially different from that of other employees; the work release employees could not advance in pay, could not be promoted, could not work overtime, and could only continue in their employment if the prison authorities determined that they were making satisfactory progress. 145 N.L.R.B. 948, 951–52 (1964). The Board underscored these differences in how work release and other employees were treated in explaining why it would not follow *National Welders* in its subsequent decisions holding that work release employees did share a community of interest with other employees and were eligible to vote in representation elections. *See Georgia–Pacific Corp.,* 201 N.L.R.B. at 761; *Winsett–Simmonds,* 164 N.L.R.B. at 612 n. 4.

In short, the Board's precedent demonstrates long-standing policy recognition that

whether work release employees share a community of interest with other employees turns on their status in the employee relationship, and not on the fact that they are under the ultimate control of prison authorities. A community of interest exists if work release employees are integrated into the employer's workforce and treated the same on the job as other employees, despite the restrictions to which they may be subject at other times. This emphasis on a work release employee's status on the job is eminently reasonable, since the focus of the community of interests test is on the interests of employees *as employees,* not their interests more generally, and is used by the Board to determine if including a group of employees in one unit would "assure to employees the fullest freedom in exercising the rights guaranteed by [the Act]." 29 U.S.C. § 159(b). Moreover, the Board has held in other contexts that employees subject to the ultimate control of outside forces may share a community of interest with other employees if they are treated the same as other employees when on the job. *See Winsett–Simmonds,* 164 N.L.R.B. at 612; *Terri–Lee, Inc.,* 103 N.L.R.B. 995, 996 (1953); *compare Shepherd's Uniform & Linen Supply, Co.,* 274 N.L.R.B. 1423, 1423, 1985 WL 45919 (1985) (vocational student shares a community of interest with other employees where vocational school's rules did not require employer to treat student differently from other employees) *with Towne Chevrolet,* 230 N.L.R.B. 479, 479–80, 1977 WL 8808 (1977) (vocational student does not share a community of interest with other employees where student was not considered regular employee and employer was required to prepare reports on student's progress and train student).

In the decision before us, however, the Board made no reference to this long-standing policy or to the *Winsett–Simmonds* test, other than to comment that "the factual situation presented here has not occurred before" and the earlier cases were "distinguishable." *Speedrack I,* 320 N.L.R.B. at 628. Contrary to what the Board claimed, however, many of the differences on which it focused were specifically considered and dismissed as insignificant in *Winsett–Simmonds, Georgia–Pacific* and *Rosslyn.* For example, the Board emphasized that work release employees unlike other employees were required to return promptly to the work release center when not working, which meant that they would not be able to picket or attend after-hour union meetings. But in *Winsett–Simmonds* the Board specifically held that the requirement that work release employees return promptly to their work release facility did not preclude finding that a shared commonality of interest existed. 164 N.L.R.B. at 612. The Board majority also stressed that the work release employees were subject to prison discipline if they engaged in misconduct or arguments at work, refused to work overtime and could be removed from their employment by the DOC. But in *Winsett–Simmonds* the Board denied that differences in the work release employees' ability to perform overtime or the fact that they had to "abide by certain rules of conduct" and could have their employment ended by corrections officials were significant. *Winsett–Simmonds,* 164 N.L.R.B. at 611–12; *see also Rosslyn,* 713 F.2d at 63–64 (community of interest exists even though prison officials could terminate inmates' employment and inmates were required to "behave responsibly"); *Georgia–Pacific,* 201 N.L.R.B. at 761 (community of interest exists even though inmates could only work overtime if their transportation back to the prison can be arranged).

More importantly, the differences emphasized by the Board are irrelevant under the *Winsett–Simmonds* test, because they simply reflect the ultimate control that prison authorities exercise over work release inmates and do not affect the work release employees in their status as employees. This is true even of the DOC requirement that work release employees must work overtime when asked. Employers often require employees to work overtime and the Board majority did not cite any evidence in the record indicating that the DOC's mandatory overtime requirement served in practice to differentiate the conditions under which work release employees and Speedrack's other employees worked. Rather, the Board simply insisted that the mere fact that other employees were not subject to prison discipline as well as

employer discipline for rejecting overtime— or for engaging in job misconduct or quitting without good cause—was an "obvious and substantial" difference between the two groups of employees. *Id.* at 628. However, *Winsett–Simmonds* and the Board's other work release cases make clear that differences which do not serve to differentiate work release employees from other employees in their relationship to their employer are irrelevant to the determination of whether a shared community of interest exists. Of course, the Board has authority to revisit its policy determinations. But if it decides to do so, it must provide "a reasoned analysis" for "changing its course." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *United Steelworkers of America v. NLRB*, 983 F.2d 240, 244–45 (D.C.Cir.1993). The Board has not even attempted to do so here.

The factor on which the Board appeared to put greatest weight was its finding that work release employees had to avoid getting into arguments when raising complaints. The Board concluded that, as a result, the "[work release employees] would not be able to participate meaningfully in the grievance-arbitration process." *Speedrack I,* 320 N.L.R.B. at 628. An inability to participate in grievance-arbitration procedures might be a sufficient basis on which to hold that the work release employees did not share a community of interest with the other employees. We do not need to reach this question, however, because the Board's conclusion regarding the ability of work release employees to utilize grievance and arbitration procedures is not reasonable or supported by substantial evidence in the record.

In reaching its conclusion the Board quoted the testimony of Corrections Officer Robert Newton ("Newton"), who stated that "if he does have a problem, we hope the inmate will come to us also. We don't want him going down there blowing off, you know, and causing an argument or something." *Id.* at 627 n. 3. From this the Board inferred that work release employees would not be able to use any grievance and arbitration process, because "[i]t is difficult to imagine how a complaint or grievance against the Employer can be presented to the Employer without running the risk of 'causing an argument or something.' " *Id.* at 628. However, Newton also testified there was no work release program rule which would prevent a work release employee from filing a formal or informal complaint with an employer. Transcript at 253–54.[4] Further, Newton only stated that work release program officials *hoped* work release employees would also come to them, not that this was their only means of redress. Given Newton's explicit testimony that the work release program would not prevent an inmate from using grievance or arbitration processes, it is unreasonable to read Newton's statement to mean that work release employees would be disciplined for getting into any argument with their employer over a grievance, even an argument that took the form of an even-toned disagreement. Indeed, as Chairman Gould argued in dissent, Newton's testimony is far more reasonably interpreted as indicating only that work release program officials were "concerned about prisoners engaging in angry outbursts on the job," *Speedrack I,* 320 N.L.R.B. at 629 n. 3, and work release employees might well be able to use the grievance process meaningfully even if they had to avoid "angry outbursts." In any event, they might be able to do so even if, as the Board majority claimed, they had to avoid all arguments, since they could have a union representative negotiate on their behalf. Consequently, the Board's conclusion that work release employees would not be able to use grievance and

---

**4.** Newton's testimony on this score is supported by a letter written by the General Counsel of DOC and approved by the DOC Commissioner, which states that "[i]f the employer and the union agree to a grievance resolution procedure, work release inmates may utilize and participate in that procedure to the same extent as other bargaining unit members who are not union members." J.A. tab 15, Bd. Ex. 7 at 2. Since this letter was written after the election and in response to an inquiry by Speedrack, we do not rely on it in reaching our decision, other than to note that the Board never addresses this statement by the DOC in concluding, to the contrary, that DOC requirements would prevent work release employees from making use of grievance and arbitration procedures.

arbitration procedures available to employees generally is simply not supported by the record.

■ We also need not address whether the DOC prohibits work release employees from joining unions, and if it does so, whether this policy is preempted by the NLRA or would be sufficient to prevent the work release employees from sharing a community of interest with the other employees. Although Chairman Gould focused on this policy in his dissent, the Board majority explicitly denied that it was relying on this policy in determining that work release employees would be unable to participate in strikes and other "activities [that] are part and parcel of the collective-bargaining process." *Id* at 628 & n. 8. It is a basic principle of administrative law that a court can only affirm an agency on the basis of same rationale relied on by the agency. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947); *see also Oil, Chemical & Atomic Workers v. NLRB*, 46 F.3d 82, 92–93 (D.C.Cir.1995) (refusing to consider explanation for agency action not adopted by a majority of the Board).

In sum, the Board's decision holding that the work release employees did not share a community of interest with other unit employees was unreasonable because it completely ignored applicable Board precedent. Since the Union's certification was based on a vote count from which the votes of the work release employees were excluded, we reverse the Board's order finding that Speedrack committed an unfair labor practice by refusing to bargain with the Union.

### III. REMEDY

It is apparent from the record that the work release employees in this case enjoyed the same employment relationship with Speedrack as did other unit employees. The work release employees were "completely integrated" into Speedrack's workforce. *Speedrack I*, 320 N.L.R.B. at 629 (Chairman Gould, dissenting). As the Board majority itself noted, the work release employees "receive[d] the same wages, vacation, holidays, health insurance, and other benefits as 'free

world' employees." *Id.* at 627. Undisputed evidence in the record also established that the work release employees "work[ed] side by side with the 'free world' employees and [we]re subject to same supervision" and the same working conditions as the other employees. *Id.* at 629 (Chairman Gould, dissenting).

Thus, under *Winsett–Simmonds* and the Board's other cases, Speedrack's work release employees appear to share a community of interest and to be eligible to vote in the representation election. But the Board must be the one to apply this precedent in the first instance and determine if the existence of a shared community of interest between work release employees and other employees should continue to turn solely on the status of the work release employees in the employee relationship. It is the Board, and not this court, that "has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990).

Consequently, we remand for the Board to reconsider its decision holding that Speedrack's work release employees are not eligible to vote in the representation election in light of *Winsett–Simmonds* and the Board's other precedent. If the Board decides to abandon its prior precedent, it must adequately justify any new policy it adopts. In addition, if the Board decides that the work release employees are eligible to vote in the election, the Board should also determine whether the Union is the exclusive bargaining representative when the ballots of the work release employees are included and, if the Union does not have a majority, whether to set aside the results of the election and direct that a second election be held, given the violations of the Act that the Board found Speedrack committed during the first election.

### IV. CONCLUSION

We conclude that the Board's determination that the work release employees were

 

not eligible to vote in the representation election was unreasonable. We therefore reverse the Board's order finding that Speedrack committed an unfair labor practice by refusing to bargain with the Union and remand for further proceedings consistent with this opinion.

*So ordered.*