# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 19, 2007        Decided January 4, 2008

No. 06-1329

AGRI PROCESSOR CO., INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with
06-1349

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the National
Labor Relations Board

———

*Jeffery A. Meyer* argued the cause for petitioner. On the brief was *Carmelo Grimaldi*.

*Julie B. Broido*, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, and *Kira Dellinger Vol*, Attorney. *Linda Dreeben*, Deputy Assistant General Counsel, entered an appearance.

Before: HENDERSON, TATEL, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

TATEL, *Circuit Judge*: A company whose workers recently voted to unionize refuses to bargain with them, claiming that most of those who voted are undocumented aliens. The company argues that undocumented aliens are prohibited from unionizing because they do not qualify as "employees" protected by the National Labor Relations Act. Because the company's argument ignores both the Act's plain language and binding Supreme Court precedent, we deny its petition for review.

**I.**

Petitioner Agri Processor Co. is a wholesaler of kosher meat products based in Brooklyn, New York. In September 2005, the company's employees voted to join the United Food and Commercial Workers union. When the company refused to bargain, the union filed an unfair labor practice charge with the National Labor Relations Board.

The Board's General Counsel issued a complaint charging that Agri Processor's refusal to bargain violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 151-169, which make it "an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [the Act]; . . . [or] (5) to refuse to bargain collectively with the representatives of his employees." *Id.* § 158(a)(1), (5). In a hearing before an administrative law judge, the company claimed that after the

election it put the Social Security numbers given by all the voting employees into the Social Security Administration's online database and discovered that most of the numbers were either nonexistent or belonged to other people. Based on this evidence, the company alleged that most of the workers who had voted in the election were aliens unauthorized to work in the United States. Arguing that undocumented workers do not count as "employees" protected by the NLRA, the company claimed the election was invalid. The company also asserted that undocumented aliens may not belong to the same bargaining unit as legal workers, rendering improper the bargaining unit created by the Board.

Relying on Supreme Court precedent and the Board's decision in *Concrete Form Walls, Inc.*, 346 N.L.R.B. No. 80 (Apr. 13, 2006), the ALJ rejected the company's arguments, sustained the charged violations, and ordered Agri Processor to bargain with the union. *Agri Processor Co.*, 347 N.L.R.B. No. 107, at 3 (Aug. 31, 2006). The Board unanimously adopted the ALJ's recommendations. *Id.* at 1. Though one Board member noted that "the average person" might find it peculiar that an employer must bargain with illegal aliens, he acknowledged that the NLRA compelled this result. *Id.* at 1 n.2.

The company petitions for review, still arguing that undocumented aliens are not employees under the NLRA and may not belong to the same bargaining unit as legal workers. The Board cross-petitions for enforcement.

**II.**

According to the Board, Agri Processor's contention that undocumented aliens are not "employees" protected by the NLRA ignores the Act's plain language and the Supreme Court's decision in *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984). We agree.

4

The NLRA defines the term "employee" expansively and lists only a few limited exceptions:

> The term "employee" shall include any employee . . . , but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act . . . , or by any other person who is not an employer as herein defined.

29 U.S.C. § 152(3). In *Sure-Tan*, the Supreme Court held that this definition clearly includes undocumented aliens:

> The breadth of [the NLRA's] definition [of "employee"] is striking: the Act squarely applies to "any employee." The only limitations are specific exemptions for agricultural laborers, domestic workers, individuals employed by their spouses or parents, individuals employed as independent contractors or supervisors, and individuals employed by a person who is not an employer under the NLRA. *See* 29 U.S.C. § 152(3). Since undocumented aliens are not among the few groups of workers expressly exempted by Congress, *they plainly come within the broad statutory definition of "employee."*

467 U.S. at 891-92 (emphasis added).

Remarkably, Agri Processor's brief neither acknowledges this controlling language in *Sure-Tan* nor even quotes the NLRA's definition of "employee." Instead, the company focuses

exclusively on the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359, which made it illegal for companies knowingly to employ undocumented aliens, 8 U.S.C. § 1324a(a)(1), and on *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), which held that IRCA bars the Board from awarding backpay to undocumented aliens. Though Agri Processor never articulates this clearly, its argument seems to be that IRCA, passed after *Sure-Tan*, somehow amended the NLRA to exclude undocumented aliens from its coverage, and that *Hoffman Plastic* overruled *Sure-Tan*. In fact, however, neither IRCA nor *Hoffman Plastic* supports the company's argument.

To begin with, nothing in IRCA's text alters the NLRA's definition of "employee." NLRA section 2(3), 29 U.S.C. § 152(3), continues to define "employee" exactly the same way it did when the *Sure-Tan* Court held that "undocumented aliens . . . plainly come within the broad statutory definition of 'employee.'" 467 U.S. at 892. Thus, Agri Processor must be arguing that IRCA and the NLRA conflict, requiring us to read IRCA as implicitly repealing the NLRA's definition of "employee" to the extent that it includes undocumented aliens. But "where two statutes are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984) (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 133-34 (1974)). Thus, courts should not infer that one statute has partly repealed another "unless the later statute expressly contradicts the original act or unless such a construction is absolutely necessary . . . in order that the words of the later statute shall have any meaning at all." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2532 (2007) (citations and internal quotation marks omitted). Neither condition is even arguably met here. Because IRCA nowhere

states that undocumented aliens no longer qualify as employees under the NLRA, it does not "expressly contradict the original act." And IRCA has meaning without being read as partly repealing the NLRA: it prohibits employers from hiring undocumented aliens, which would otherwise be legal. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 381 (1996) ("The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an irreconcilable conflict between the two federal statutes at issue." (citations and internal quotation marks omitted)).

Moreover, "[a]mendments by implication, like repeals by implication, are not favored," *United States v. Welden*, 377 U.S. 95, 102 n.12 (1964), "and will not be found unless an intent to repeal [or amend] is 'clear and manifest.'" *Rodriguez v. United States*, 480 U.S. 522, 524 (1987) (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)). Here, not only is there no clear indication that Congress intended IRCA implicitly to amend the NLRA, but all available evidence actually points in the opposite direction. The House Judiciary Committee Report on IRCA is clear:

> It is not the intention of the Committee that the employer sanctions provisions of the bill be used to undermine or diminish in any way labor protections in existing law, or to limit the powers of federal or state labor relations boards, labor standards agencies, or labor arbitrators to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by existing law. In particular, the employer sanctions provisions are not intended to limit in any way the scope of the term "employee" in Section 2(3) of the National Labor

Relations Act (NLRA), as amended, or of the rights and protections stated in Sections 7 and 8 of that Act. As the Supreme Court observed in *Sure-Tan Inc. v. NLRB*, 467 U.S. 883 (1984)[,] application of the NLRA "helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment."

H.R. Rep. No. 99-682, pt. 1, at 58 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5662.  Similarly, the House Education and Labor Committee Report says that no provision of IRCA

limit[s] the powers of State or Federal labor standards agencies such as the Occupational Safety and Health Administration, the Wage and Hour Division of the Department of Labor, the Equal Employment Opportunity Commission, the National Labor Relations Board, or Labor arbitrators, in conformity with existing law, to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by these agencies.  To do otherwise would be counter-productive of our intent to limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment.

*Id.* pt. 2, at 8-9, *as reprinted in* 1986 U.S.C.C.A.N. 5757, 5758. These two passages are the only places in IRCA's legislative history where Congress discussed the NLRA.  Rather than showing that IRCA was "clear[ly] and manifest[ly]" intended to amend the NLRA's definition of "employee," *Rodriguez*, 480 U.S. at 524, they show precisely the opposite.

Perhaps Agri-Processor is arguing that in making it unlawful for employers to hire undocumented aliens, Congress must have intended to end job protections for such workers, even though it never said as much anywhere in IRCA's text or history. But this hardly follows, for it is quite possible that even as Congress barred employers from hiring undocumented aliens, it still intended for the NLRA to apply to such aliens. The *Sure-Tan* Court explained: "Application of the NLRA [to illegal aliens] helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment." 467 U.S. at 893. And "[i]f an employer realizes that there will be no advantage under the NLRA in preferring illegal aliens to legal resident workers, any incentive to hire such illegal aliens is correspondingly lessened." *Id.*

In sum, there is absolutely no evidence that in passing IRCA Congress intended to repeal the NLRA to the extent its definition of "employee" includes undocumented aliens. Thus, the NLRA's plain language, as applied by the Supreme Court in *Sure-Tan*, continues to control after IRCA, as the Seventh, Ninth, and Eleventh Circuits have all held. *See NLRB v. Concrete Form Walls, Inc.*, 225 Fed. App'x 837 (11th Cir. 2007) (upholding the NLRB's conclusion in *Concrete Form Walls*, 346 N.L.R.B. No. 80, that undocumented workers remain statutory employees under the NLRA after IRCA); *NLRB v. Kolkka*, 170 F.3d 937, 941 (9th Cir. 1999) (holding that the NLRA continues to define undocumented aliens as employees after IRCA); *Del Rey Tortilleria, Inc. v. NLRB*, 976 F.2d 1115, 1121 (7th Cir. 1992) (same); *cf. Patel v. Quality Inn S.*, 846 F.2d 700, 704-05 (11th Cir. 1988) (rejecting the claim that IRCA implicitly amended the Fair Labor Standards Act's definition of "employee"). No circuit court has reached a contrary conclusion.

The dissent, instead of attempting to show implied repeal under the Supreme Court's established rules for doing so, creates its own rule. It claims we should read IRCA as implicitly amending the NLRA not because of anything Congress said in IRCA's text or history, but rather because of something the *Sure-Tan* Court said two years before IRCA's enactment in a passage Agri Processor never cites. Specifically, after the *Sure-Tan* Court held that "undocumented aliens . . . plainly come within the [NLRA's] broad statutory definition of 'employee,'" 467 U.S. at 892, it went on to explain why it found no conflict between its holding and then-existing immigration law. The Court said that because the law at that time did not bar hiring undocumented aliens, "there [wa]s no reason to conclude" that immigration law conflicted with the NLRA's protection of such employees. *Id.* at 893. According to the dissent, this passage means that once IRCA made it unlawful to hire undocumented aliens, immigration law had to conflict with the NLRA's broad definition of "employee." *See* Dissenting Op. at 2. But this does not logically follow, as an example illustrates: "Because it's not cold outside, it's not snowing. It is now cold outside, therefore it must be snowing." *See* PATRICK J. HURLEY, A CONCISE INTRODUCTION TO LOGIC 323 (9th ed. 2005) (explaining the fallacy of denying the antecedent, in which a person reasons from a statement phrased as "because not p, not q," that once p happens q will necessarily follow). The dissent claims its reading of this passage is necessary to prevent it from being "entirely meaningless." Dissenting Op. at 6. But the *Sure-Tan* majority had an obvious reason for including the passage that is far more plausible than the dissent's theory that the Court was *holding* how it would treat a hypothetical immigration statute not before it: to refute the *Sure-Tan* dissent's claim that then-existing immigration law precluded reading the NLRA as applying to undocumented aliens. *See* *Sure-Tan*, 467 U.S. at 913 (Powell, J., dissenting).

More fundamentally, even if the Supreme Court had said immigration law would inevitably conflict with the NLRA's definition of "employee" if hiring undocumented aliens became unlawful, the Court never explained *how it would resolve* such a conflict. And rather than applying the Supreme Court's rule for determining whether two statutes irreconcilably conflict so that we must read the later as implicitly repealing the earlier, the dissent reverses the rule, stating: "if Congress in [passing IRCA] wished to say that illegal immigrant workers . . . [remain] 'employees' protected by the NLRA, it would have said so in the text of IRCA." Dissenting Op. at 9. Thus, instead of making "repeals by implication . . . disfavored," *Reg'l Rail*, 419 U.S. at 133, and demanding that "the intention of the legislature to repeal . . . be clear and manifest," *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936), the dissent presumes repeal because Congress never expressly declared that it wanted to *avoid* an implied repeal—all because of one paragraph from *Sure-Tan* the dissent misreads. But the Supreme Court "ha[s] never held that Congress must speak with different gradations of clarity depending on the specific circumstances of the relevant legislation." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 76 (2000). The dissent's rule would lead to the absurd result that the Supreme Court—or any court for that matter—could alter the plain meaning of future legislation simply by announcing what current legislation does not mean.

Of course, the dissent is correct that "[w]hen the Supreme Court has issued a statutory decision and Congress then acts to change the relevant law, it flouts congressional will for a lower court to ignore the new statute and rely reflexively on the result of the old Supreme Court case." Dissenting Op. at 4. But this principle has no application here because Congress never "change[d] the relevant law." As we have shown above, IRCA neither explicitly nor implicitly amended the NLRA. Thus, this case is nothing like the examples the dissent cites in which the

Supreme Court interpreted a statute and Congress later amended *that statute*. *See id.* at 5. In those examples, Congress obviously overturned the Supreme Court's decisions—it expressly changed the statutory provision the Court had interpreted to achieve the opposite result. By contrast, after the *Sure-Tan* Court read the plain language of the NLRA's definition of "employee" to cover undocumented aliens, Congress did not change the NLRA to "expressly exempt[]" undocumented aliens from its coverage. *Sure-Tan*, 467 U.S. at 892. Instead, Congress changed immigration law, never even hinting it intended to amend the NLRA. Congress's decision not to amend the NLRA's definition of "employee" is all the more striking given that it has previously amended that definition when it disagreed with the Supreme Court's interpretation of the Act. *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 2(3), 61 Stat. 136, 137-38 (amending the NLRA's definition of "employee" to exclude independent contractors and supervisors, whom the Supreme Court had held covered under the original version of the Act in *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 131-32 (1944), and *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 488-90 (1947), respectively); *see also Kimbrough v. United States*, No. 06-6330, slip op. at 14 (U.S. Dec. 10, 2007) ("Drawing meaning from silence is particularly inappropriate here, for Congress has shown that it knows how to [address the question at issue] in express terms.").

The dissent also criticizes our use of legislative history. But because IRCA, by its terms, does not amend the NLRA, it is the dissent that—at least under the Supreme Court's rules for implied repeal—must find in IRCA's history "clear and manifest" legislative intent to amend the NLRA. *Rodriguez*, 480 U.S. at 524. We cite legislative history only to demonstrate how far Agri Processor and the dissent are from meeting this standard. Thus, *Shannon v. United States*, 512 U.S. 573 (1994), upon which the dissent relies, has nothing to do with this case.

There the Court refused to "abandon altogether the text of the statute" in order to "give effect to [a] snippet of legislative history." *Id.* at 583. Here, by contrast, we hew closely to the text of the NLRA and IRCA, while the dissent seeks to "abandon [it] altogether."

Returning now to Agri Processor's arguments, we think the company's reliance on *Hoffman Plastic* is entirely misplaced. In that case, the Supreme Court addressed only what remedies the Board may grant undocumented aliens when employers violate their rights under the NLRA. Nowhere in *Hoffman Plastic* did the Court hold that IRCA leaves undocumented aliens altogether unprotected by the NLRA. Indeed, the Court explicitly declined to revisit *Sure-Tan*'s holding that undocumented aliens are employees under the NLRA, 535 U.S. at 149 n.4, and said that remedies other than backpay—such as cease and desist orders—can still be imposed for NLRA violations committed against undocumented aliens, *see id.* at 152. Thus, neither IRCA nor *Hoffman Plastic* alters the NLRA's definition of "employee" as applied by the Supreme Court in *Sure-Tan*.

Even were we less certain about the meaning of *Hoffman Plastic* and IRCA, we would still reach the same result. First, if we thought that *Hoffman Plastic*'s reasoning cast some doubt on *Sure-Tan*'s clear holding—which we don't—we would still follow *Sure-Tan*, for as the Supreme Court held in *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989): "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.* at 484. *Sure-Tan*, not *Hoffman Plastic*, "directly controls" this case.

13

Second, even were it unclear whether the NLRA's definition of "employee" included undocumented aliens—which it isn't—we would still defer to the Board's decision to include them. "Since the task of defining the term 'employee' is one that 'has been assigned primarily to the [Board],' the Board's construction of that term is entitled to considerable deference, and we will uphold any interpretation that is reasonably defensible." *Sure-Tan*, 467 U.S. at 891 (quoting *Hearst*, 322 U.S. at 130). Including undocumented aliens within the meaning of "employee" is entirely reasonable because "extending the coverage of the [NLRA] to such workers is consistent with the Act's avowed purpose of encouraging and protecting the collective-bargaining process." *Id.* at 892. Leaving undocumented workers without the NLRA's protections would "create[] a subclass of workers without a comparable stake in the collective goals of their legally resident co-workers, thereby eroding the unity of all the employees and impeding effective collective bargaining." *Id.*

Finally, Agri Processor suggests that if neither *Hoffman Plastic* nor IRCA requires the result it seeks, we should still rule in its favor "in light of the recent policy changes and debate over the burden of illegal immigration in this country." Pet'r's Opening Br. 32. Given *Sure-Tan* and the NLRA's broad definition of "employee," however, the company must make this argument to Congress, not this court.

**III.**

This brings us to Agri Processor's second argument—that the Board may not place undocumented aliens and legal workers in the same bargaining unit. NLRA section 9(b) "vests in the Board authority to determine 'the unit appropriate for the purposes of collective bargaining.'" *NLRB v. Action Auto., Inc.*, 469 U.S. 490, 494 (1985) (quoting 29 U.S.C. § 159(b)). "[I]n

defining bargaining units, [the Board's] focus is on whether the employees share a 'community of interest.'" *Id.* at 494. The community of interests test turns "on the interests of employees *as employees*, not their interests more generally." *Speedrack Prods. Group, Ltd. v. NLRB*, 114 F.3d 1276, 1280 (D.C. Cir. 1997). The Board, moreover, has "broad discretion in making unit determinations, and its unit determinations are accorded particular deference by a reviewing court." *Id.* at 1278.

Agri Processor argues that undocumented aliens and legal workers lack a community of interest in two respects. First, the company argues that "[t]he incorporation of the undocumented workers with otherwise lawful and eligible workers as members of the bargaining unit . . . caused the votes of the eligible workers to become diluted, resulting in the disenfranchisement of the bargaining unit's lawful and eligible workers." Pet'r's Opening Br. 33. As we have already explained, however, undocumented aliens qualify as employees under the NLRA, so their votes are just as valid as those of legal workers.

Second, Agri Processor maintains that because undocumented aliens have no legitimate expectation of continued future employment, their interests differ from those of legal employees. But as the Board explains:

> [U]ndocumented workers' fear of detection and termination does not prevent them from sharing a community of interest with their coworkers. That fear is counterbalanced by a hope of continuing their employment indefinitely, giving them a similar expectation of future employment as 'regular' at-will employees who hold their jobs at the whim of their employers.

Resp't's Br. 21. The Board also correctly points out that "expected tenure is not necessarily dispositive of the community-of-interest inquiry." *Id.* Indeed, the Board has previously approved—and we have upheld—allowing workers to vote even when, at the time of the election, the workers knew they would soon leave for another job. *See, e.g.*, *Saint-Gobain Indus. Ceramics, Inc. v. NLRB*, 310 F.3d 778, 782-83 (D.C. Cir. 2002).

Furthermore, "the focus of the community of interests test is on the interests of employees *as employees*, not their interests more generally." *Speedrack*, 114 F.3d at 1280. Thus, "to determine if a community of interest exists," the Board typically looks at "the similarity of wages, benefits, skills, duties, working conditions, and supervision of the employee." *Id.* at 1278. With regard to each of these factors, undocumented workers and legal workers in a bargaining unit are identical. While undocumented aliens may face penalties for violating immigration laws, they receive the same wages and benefits as legal workers, face the same working conditions, answer to the same supervisors, and possess the same skills and duties.

In short, Agri Processor has failed to show that the interests of undocumented workers *as employees* differ in any way from those of legal workers. Indeed, the company has come nowhere close to making the type of showing needed to overcome the high degree of deference we owe the Board's unit determinations.

**IV.**

For the reasons stated above, we deny Agri Processor's petition for review and grant the Board's cross-petition for enforcement.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring:

It seems "somewhat peculiar" indeed, as Board Member Kirsanow observed, to order an employer "to bargain with a union representing employees that the [employer] would be required to discharge under the Immigration Reform and Control Act, 8 U.S.C. § 1324a." *Agri Processor Co.*, 347 N.L.R.B. No. 107, at 1 n.2 (2006). Moreover, as the dissent makes clear, it is hard to ignore *Sure-Tan*'s reliance on the absence of any provision in the Immigration and Naturalization Act making it "a separate criminal offense for an alien to accept employment after entering this country illegally," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 893 (1984), and the fact that, shortly thereafter, the Congress enacted IRCA, which does precisely that. Nonetheless, *Sure-Tan* concluded that the broad statutory definition of "employee" in the NLRA does not exclude an illegal immigrant and we must follow *Sure-Tan*'s interpretation until the Supreme Court otherwise directs or the Congress expressly limits the term's scope. *See Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 478-79 (1987). Accordingly, I join the majority opinion.

KAVANAUGH, *Circuit Judge*, dissenting: Their immigration status apparently unbeknownst to their employer, illegal immigrant workers voted in a union election and affected the election's outcome. The employer later discovered that the workers were illegal; terminated them as required by federal immigration law; and sought to overturn the tainted union election. The NLRB ruled that the union election must stand because illegal immigrant workers are "employees" under the National Labor Relations Act and thus are entitled to vote in union elections. The majority opinion agrees.

I respectfully dissent. The result reached by the majority opinion not only is "somewhat peculiar," as Judge Henderson acknowledges, but also is inconsistent with Supreme Court precedent and the Immigration Reform and Control Act of 1986. As the Supreme Court has explained, the term "employee" in the NLRA must be interpreted in conjunction with the immigration laws. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 892-93 (1984). Applying the *Sure-Tan* analysis, I would hold that an illegal immigrant worker is not an "employee" under the NLRA for the simple reason that, ever since 1986, an illegal immigrant worker is not a lawful "employee" in the United States. I would therefore vacate the Board's order and remand for the Board to determine how a party can challenge a union election or certification upon discovering after the fact that illegal immigrant workers voted in the election and affected the outcome.

\* \* \*

In 1984, the Supreme Court considered whether an employer committed an unfair labor practice by reporting illegal immigrant workers to immigration officials in response to the workers' union activity. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984). In an opinion by Justice O'Connor, the Court explained that the NLRA's definition of "employee"

must be interpreted in conjunction with the immigration laws. *Id.* at 892-93. The Court then held that illegal immigrant workers were "employees" covered by the NLRA because – "[c]ounterintuitive though it may be" – the immigration laws *as they stood in 1984* did not prohibit employment of illegal immigrant workers. *Id.* at 892. The Court stated:

> For whatever reason, Congress has not adopted provisions in the INA making it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization. . . . Moreover, Congress has not made it a separate criminal offense for an alien to accept employment after entering this country illegally. *Since the employment relationship between an employer and an undocumented alien is hence not illegal under the INA*, there is no reason to conclude that application of the NLRA to employment practices affecting such aliens would necessarily conflict with the terms of the INA.

*Id.* at 892-93 (emphasis added and citation omitted).

As I read the decision, the Court in *Sure-Tan* thus applied a straightforward analytical framework to govern the question whether illegal immigrant workers are "employees" under the NLRA. If federal law does not prohibit employment of illegal immigrant workers, then the workers can be "employees" under the NLRA. If on the other hand federal law prohibits employment of illegal immigrant workers, then the workers are not "employees" under the NLRA.[1]

---

[1] In *Sure-Tan*, Justice Powell and Justice Rehnquist dissented, arguing that even without a specific congressional prohibition against employing illegal immigrant workers, it is "unlikely that Congress intended the term 'employee' to include – for purposes of

When it decided *Sure-Tan* in 1984, the Court was well aware of the significance of tying the NLRA's definition of "employee" to the immigration laws' prohibition or non-prohibition on employment of illegal immigrant workers. The Court decided *Sure-Tan* in the midst of an intense congressional debate on immigration legislation. At oral argument in *Sure-Tan*, moreover, one of the Justices asked a direct question about proposed legislation banning employment of illegal immigrant workers. *See* Transcript of Oral Argument, *Sure-Tan*, 467 U.S. 883 (No. 82-945), *available at* http://www.oyez.org/cases (Court: "There is legislation pending in Congress to make it illegal, to make it an unlawful act, a crime to hire an undocumented alien."). And just five days before the Court issued its decision, the House of Representatives passed a bill to prohibit the employment of illegal immigrants. *See* 130 CONG. REC. 12,794-95 (June 20, 1984). It would defy credulity to suggest that the Supreme Court either was unaware of the significance of its discussion of immigration law or intended it to be meaningless.

Two years after *Sure-Tan*, as the Court had foreshadowed, Congress passed and President Reagan signed a comprehensive immigration bill that prohibited employment of illegal immigrant workers. The landmark Immigration Reform and Control Act of 1986, known as IRCA, "forcefully

---

being accorded the benefits of that protective statute [the NLRA] – persons wanted by the United States for the violation of our criminal laws." *Sure-Tan*, 467 U.S. at 913 (Powell, J., concurring in part and dissenting in part). The *Sure-Tan* majority reasoned, however, that a congressional prohibition on employment of illegal immigrants was necessary in order to conclude that illegal immigrant workers were not "employees" under the NLRA. As a result of passage of the Immigration Reform and Control Act in 1986, of course, such a prohibition now exists.

made combating the employment of illegal aliens central to the policy of immigration law." *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (internal quotation marks and alteration omitted). Under IRCA, it is now a criminal and civil violation for an employer to knowingly hire an illegal immigrant. Pub. L. No. 99-603, § 101, 100 Stat. 3359, 3360 (codified as amended at 8 U.S.C. § 1324a). If an employer hires a worker and later discovers that the worker is in the United States illegally, the employer must fire the worker immediately. 8 U.S.C. § 1324a(a)(2). And federal law provides that an employee may not use fraudulent identification documents in completing the immigration forms that are required to be employed in the United States. 8 U.S.C. § 1324c(a).

IRCA "significantly changed" the "legal landscape" that had existed in *Sure-Tan. Hoffman*, 535 U.S. at 147; *see also Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184, 188 (4th Cir. 1998) (en banc) (IRCA brought about "monumental change" in immigration law). Applying the straightforward *Sure-Tan* analysis in the wake of IRCA, I would hold that an illegal immigrant worker is not an "employee" under the NLRA because Congress has now made it illegal for illegal immigrants to be employed.

The majority opinion and the Board rely on the result in *Sure-Tan. See* Maj. Op. at 3-4; Board Br. at 12-13. But *Sure-Tan* explained that the interpretation of "employee" depends on the status of the immigration laws. 467 U.S. at 892-93. Congress then changed those immigration laws in 1986. When the Supreme Court has issued a statutory decision and Congress then acts to change the relevant law, it flouts congressional will for a lower court to ignore the new statute and rely reflexively on the result of the old Supreme Court case. Relying on *Sure-Tan*'s pre-IRCA interpretation of

"employee" is roughly like relying on *District of Columbia v. Carter* to dismiss a § 1983 suit against a D.C. police officer even though Congress later changed the statute to provide that such suits are cognizable under § 1983. *Compare Carter*, 409 U.S. 418, 432-33 (1973), *with* Pub. L. No. 96-170, § 1, 93 Stat. 1284, 1284 (1979) (amending 42 U.S.C. § 1983). Or relying on *Hubbard v. United States* to hold that 18 U.S.C. § 1001 does not prohibit false statements in judicial proceedings even though Congress later changed the statute to provide otherwise. *Compare Hubbard*, 514 U.S. 695, 715 (1995), *with* Pub. L. No. 104-292, § 2, 110 Stat. 3459, 3459 (amending 18 U.S.C. § 1001). Or relying on *Westfall v. Erwin* to limit federal employees' immunity from suit even though Congress later passed the Westfall Act to ensure such immunity. *Compare Westfall*, 484 U.S. 292, 300 (1988), *with* Pub. L. No. 100-694, §§ 2, 5-6, 102 Stat. 4563, 4563-65 (amending 28 U.S.C. § 2679).[2]

Turning next to a logic textbook, the majority opinion contends that *Sure-Tan* is not as clear as it could have been on how the NLRA's coverage of "employees" would be affected by a change in the immigration laws. *See* Maj. Op. at 9. But we nonetheless have to decide whether the *better* reading of *Sure-Tan* is that the NLRA's coverage of illegal immigrant workers as "employees" (i) depends on whether illegal immigrant workers may be lawfully employed in the United States; or (ii) does not depend on whether illegal immigrant

---

[2] The doctrine of *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989), has no application in this case. That doctrine instructs lower courts not to assume that a Supreme Court decision implicitly overruled one of the Court's prior precedents. In this case, however, we are not considering whether a Supreme Court decision implicitly overruled an earlier Supreme Court decision. Rather, we are considering the effect of a *congressional change* in the governing law.

6

workers may be lawfully employed in the United States. In my judgment, the first reading – that the NLRA's coverage of illegal immigrant workers as "employees" depends on whether illegal immigrant workers may be lawfully employed in the United States – is far and away the better interpretation of *Sure-Tan*. After all, under the majority opinion's reading, *Sure-Tan*'s discussion of the interaction of the NLRA and the immigration laws would be entirely meaningless. *See* 467 U.S. at 892-93. I am reluctant to reach that conclusion about Supreme Court decisions; I am especially reluctant to do so here given that the Supreme Court was well aware of the significance of its opinion in light of the congressional proposals on illegal immigration then being considered and debated.

The majority opinion also refers to the plain language of the NLRA. *See* Maj. Op. at 3-4. But according to the Supreme Court, that's only half the equation. The other half of the equation is the plain language of the immigration laws. *Sure-Tan* established that the NLRA's definition of "employee" is not to be considered in isolation, but rather in conjunction with the immigration laws and whether those laws prohibit the employment of illegal immigrants. *See* 467 U.S. at 892-93. Since 1986, federal law has contained just such a prohibition. The majority opinion would be correct if the Supreme Court in *Sure-Tan* had said something like "we interpret the NLRA's definition of 'employee' without regard to a worker's employment status under the immigration laws." In fact, the Supreme Court said just the opposite.[3]

---

[3] According to the majority opinion, we cannot read the NLRA's coverage of "employees" to be affected by the immigration laws because that would suggest that the immigration laws implicitly repealed the NLRA, which courts do not lightly find. *See* Maj. Op. at 5-6. With respect, the majority opinion's

The majority opinion and the Board imply that *Hoffman* reaffirmed *Sure-Tan*. *See* Maj. Op. at 5, 12-13; *Agri Processor Co.*, 347 N.L.R.B. No. 107, at 3 (2006); *see also Concrete Form Walls, Inc.*, 346 N.L.R.B. No. 80, at 4 (2006). That is incorrect. The *Hoffman* Court did not hold that, after IRCA, illegal immigrant workers are still "employees" under the NLRA. Rather, the *Hoffman* Court stated that it was not addressing the "employee" issue. *See* 535 U.S. at 150 n.4 ("Our first holding in *Sure-Tan* is not at issue here . . . ."); *see also* Brief of Petitioner at 17, *Hoffman*, 535 U.S. 137 (No. 00-1595), 2001 WL 1729616 (raising remedial issues and not challenging whether illegal immigrant worker was an "employee" under the NLRA). If anything, the language of the *Hoffman* opinion is more consistent with a conclusion that illegal immigrant workers are not employees under the NLRA. After all, *Hoffman* made clear that, in the wake of IRCA, illegal immigrant workers are not entitled to any remedies under the NLRA, such as reinstatement or back pay, even when unfair labor practices are committed against them. 535 U.S. at 151-52. The *Hoffman* Court explained that providing illegal immigrant workers with remedies under the NLRA "would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA." *Id.* at 151.

The majority opinion also relies on two House committee reports issued in connection with IRCA. *See* Maj. Op. at 6-7. The usual cautions apply to this kind of legislative history:

---

discussion of the repeal-by-implication doctrine is a sideshow because the Supreme Court has already taken the step that the majority opinion here criticizes. In *Sure-Tan*, the Court explained that the immigration laws can affect the NLRA's coverage of employees and that a prohibition on employment of illegal immigrant workers means they are not employees under the NLRA. *See* 467 U.S. at 892-93.

Committee reports are highly manipulable, often unknown by most Members of Congress and by the President, and thus ordinarily unreliable as an expression of statutory "intent." Committee reports are not passed by the House and Senate and presented to the President, as required by the Constitution in order to become law. *See* U.S. CONST. art. I, § 7; *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[J]udicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members – or, worse yet, unelected staffers and lobbyists – both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text."). The two committee reports cited by the majority opinion here, moreover, are from "one House of a politically divided Congress" – the same category of legislative history that the *Hoffman* Court rejected. 535 U.S. at 149 n.4. Indeed, one of the reports cited by the majority opinion is the exact same report that the *Hoffman* Court dismissed as a "rather slender reed." *Id.* at 149-50 n.4.

In considering the majority opinion's legislative history argument, it bears emphasis that the Court in *Sure-Tan* had stated that the NLRA's definition of "employee" depends on whether Congress prohibits employment of illegal immigrants. Given that analysis, Congress was necessarily aware that prohibiting employment of illegal immigrants could affect the NLRA's coverage of illegal immigrant workers. Indeed, someone on Capitol Hill in 1986 knew that IRCA, analyzed in light of *Sure-Tan*, could remove illegal immigrant workers from the NLRA's definition of "employee," because one of the committee reports purports to say that IRCA would not affect *Sure-Tan*'s holding. The problem is that this committee report is "in no way anchored

in the text" of IRCA, and we thus cannot rely on it. *Shannon v. United States*, 512 U.S. 573, 583 (1994). As Justice Kennedy has explained for the Court, legislative materials can have a role in statutory interpretation "only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous *terms*." *Exxon Mobil Corp.*, 545 U.S. at 568 (emphasis added). In a circumstance similar to this case, the Supreme Court flatly rejected a committee report that attempted to preserve a prior judicial precedent, stating that reliance on the report would have required the Court to "abandon altogether the text of the statute as a guide in the interpretative process." *Shannon*, 512 U.S. at 583. So too here. In light of *Sure-Tan*, if Congress in 1986 wished to say that illegal immigrant workers are prohibited from being employees in the United States but nonetheless are "employees" protected by the NLRA, it would have said so in the text of IRCA.

Contrary to the suggestion in the majority opinion, since IRCA only one other court of appeals has analyzed this issue in an opinion; it reached the same conclusion as the majority opinion here. *See NLRB v. Kolkka*, 170 F.3d 937 (9th Cir. 1999); Maj. Op. at 8. But the Ninth Circuit's decision did not grapple with the Supreme Court's analysis in *Sure-Tan* and how IRCA applies under that analysis. I thus disagree with and would not follow the Ninth Circuit's decision.

\* \* \*

Applying *Sure-Tan* and *Hoffman* in the wake of IRCA, I would hold that an illegal immigrant worker is not an "employee" under the NLRA. I would vacate the Board's order upholding the union election because the Board's order rested on the incorrect conclusion that illegal immigrant workers are "employees" under the NLRA. This particular

case involves a union election and thus does not affect or involve the illegal immigrant workers themselves because they no longer work for the employer (the law prohibits their employment) and because the Supreme Court has already held that illegal immigrant workers are not entitled to any remedies under the NLRA. *See Hoffman*, 535 U.S. at 151-52. But the question whether these illegal immigrant workers' votes should count in the union election – the particular issue in this case – is still important to (i) the legal workers, whose votes may have been diluted or overridden in the union election by the votes of illegal immigrant workers, and (ii) the employer, who may have to bargain with a union that would not have been certified but for the votes of the illegal immigrant workers. I would remand for the Board to address how a party may challenge a union election or certification upon discovering after the fact that illegal immigrant workers voted in the election and affected the outcome.